Elton SIMPSON

v.

STATE of Rhode Island.

No. 99–267–C.A.

Supreme Court of Rhode Island.

April 4, 2001.

James Moretti, Cranston, for Plaintiff.

Annie Goldberg, Jane M. McSoley, Providence, John E. Sullivan, III, Aaron L. Weisman, Providence, for Defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

Elton Simpson (Simpson) appeals from the Superior Court's denial of his application for postconviction relief filed pursuant to G.L.1956 chapter 9.1 of title 10. He had been convicted of first-degree sexual assault, burglary, assault with a dangerous weapon, and breaking and entering. In his appeal, Simpson alleges that he was denied his federal Sixth and Fourteenth Amendment right to effective assistance of counsel at his Superior Court jury trial as the result of a *per se* conflict of interest that existed between two assistant public defenders, one of whom had succeeded the other in representing him. For the reasons we hereinafter set out, we affirm the denial of his application for postconviction relief.

## I

### Facts and Case Travel

During the early morning hours of July 30, 1988, Simpson raped Jane Doe (Doe) [1] at knife-point in her bed after breaking into her apartment. After fleeing, Simpson then surreptitiously entered the apartment of Mary Roe (Roe) [2] and held a knife to her throat. He subsequently was arrested, indicted for both incidents and arraigned on one count of first-degree sexual assault, two counts of burglary, and one count of assault with a dangerous weapon. [3]

At a Superior Court bail hearing on December 1, 1988, Simpson was represented by Richard Brousseau (Brousseau), an assistant public defender in the office of the Public Defender. Despite Brousseau's admonishments, Simpson insisted upon testifying at his bail hearing, and in the course thereof provided incriminating testimony, including that he was "not sure" whether the allegations made against him were true. [4]

1. Obviously, a fictitious name to protect the identity of the victim.

2. Again, obviously a fictitious name to protect the identity of the individual.

3. One count of burglary was later reduced at trial to breaking and entering without consent.

4. Elton Simpson (Simpson) testified at the bail hearing that he was "not sure" whether Jane Doe's (Doe) allegations were true and that he recalled only going to a club, sandwich shop, and house party, and phoning Mary Roe (Roe) before he was arrested at Roe's dwelling.

Thereafter, Simpson wrote to Richard M. Casparian (Casparian), who was then the state's Public Defender, expressing his disenchantment with Brousseau and asking to be assigned a new assistant public defender. After the bail hearing, Brousseau withdrew as Simpson's attorney. Dale Anderson (Anderson), another assistant public defender, was assigned to represent Simpson at his trial.

At his Superior Court jury trial, Simpson once again insisted upon testifying. This time, he was able to testify with much greater recollection and detail than at his bail hearing in denying the criminal allegations leveled against him. On cross-examination, however, the prosecutor confronted Simpson with portions of his earlier bail hearing testimony to effectively impeach Simpson's testimonial credibility.

On April 5, 1990, a superior court trial jury, after deliberating over a two-day period, returned guilty verdicts on each charge. On June 26, 1990, sentences totaling fifty years were imposed on Simpson, twenty-five years of which were to be served and the remaining twenty-five years were suspended. Anderson, because of criticism leveled against him by Simpson after the jury returned its verdicts, then withdrew as Simpson's attorney, and Mary June Ciresi (Ciresi), an experienced attorney in private practice,

was appointed to represent Simpson in his appeal. In his appeal, Simpson challenged only his conviction on the burglary count, contending that the trial justice erred in failing to grant his motion for judgment of acquittal on that charge. We denied his appeal and affirmed his conviction on June 23, 1992. *State v. Simpson,* 611 A.2d 1390, 1394 (R.I.1992).

In 1994, Ciresi withdrew from the case. Five private defense attorneys thereafter were appointed in succession to represent Simpson in his postconviction proceedings, all of whom declined or withdrew from that representation. James T. McCormick, a private defense counsel, was the last to be appointed to represent Simpson in his postconviction proceeding.[5] Simpson's Superior Court application for postconviction relief pursuant to § 10–9.1–1 was filed on July 30, 1997.[6] In his application, Simpson contended that his federal Sixth Amendment right to effective assistance of counsel had been violated. He argued that a *per se* "conflict of interest" existed between Brousseau and Anderson, constituting a *per se* denial of his Sixth Amendment right to have effective assistance of counsel, and that because of that conflict, his public defender attorneys performed deficiently, before and at his trial.[7] Integral to both assertions was

---

**5.** It appears from the record that after Mary June Ciresi withdrew from the case, the court appointed in succession Lise J. Gescheidt, Lidia M. Sanchez, Richard Corley, Mark Smith, and Stephen Nugent.

**6.** General Laws 1956 § 10–9.1–1 provides in pertinent part:

"(a) Any person who has been convicted of, or sentenced for, a crime, a violation of law, or a violation of probationary or deferred sentence status and who claims: (1) That the conviction or the sentence was in violation of the constitution of the United States or the constitution or laws of this state; * * * (6) * * * may institute, without

paying a filing fee, a proceeding under this chapter to secure relief."

**7.** Although Simpson alleges that Dale Anderson (Anderson) performed deficiently, it is unclear whether he also contends that Richard Brousseau (Brousseau) performance fell below an "objective standard of reasonableness." In Simpson's application, he alleged that "Applicant's trial attorney did not elicit testimony or offer evidence that applicant was on medication at the time of his bail hearing testimony, which could have affected his ability to recall and his ability to testify. It is applicant's argument that the failure to do so constitutes ineffective assistance of

Simpson's contention that Brousseau had called him to testify at the bail hearing against his express wishes, and in spite of the "fact" that he had informed Brousseau that he had taken prescription medication for a back-related injury, which purportedly affected his ability to testify. Simpson contended that Anderson, who replaced Brousseau as his counsel, then should have attempted to have his bail hearing testimony excluded, but that he neglected to do so. Simpson never elaborated on how he expected that to be done. Simpson's postconviction application alleged in part only that Anderson had failed to take action with regard to the bail hearing testimony because "he and Mr. Brousseau worked together" as colleagues at the public defender's office and therefore Anderson "did not want to get involved."

At the postconviction hearings, the main evidence of the alleged *per se* "conflict of interest" and the later ineffective jury trial performance by his trial counsel, came from the testimony of Simpson.[8] Simpson testified at the postconviction hearings that he had informed Brousseau on numerous occasions that he was on prescription medication for a back problem and that this medication caused him to feel lightheaded on the day of the bail hearing.

Simpson also insisted that he had informed Brousseau, before the bail hearing, that he wished to testify only about the charges by Doe, the rape victim, and would not testify if both Doe and Roe, the second victim, testified at the bail hearing.[9] Simpson apparently had wanted the charges related to the two victims severed and wanted to have two separate bail hearings for each charge. After both Doe and Roe did in fact testify against him at the bail hearing, Simpson then alleges that he informed Brousseau during a bail hearing noon recess period that he no longer wished to testify because he would have to "incriminate" himself to "a certain extent against Mary Roe in order to protect myself against Jane Doe." At this point, Simpson then alleges that Brousseau insisted that he testify. Simpson also testified that he had informed Brousseau during this noon recess period that he did not want to testify at the bail hearing "because [he] wasn't feeling well." Simpson then alleges that he informed Brousseau that he was no longer happy with Brousseau's representation and that he wished Brousseau to remove himself from the case. According to Simpson, this angered Brousseau, and Simpson was then "under the impres-

---

counsel * * *." However, he also alleged in his application that "Applicant's conviction should be set aside because he did not have effective assistance of counsel prior to and during the trial of this case." After the postconviction hearings, in a "Memorandum," Simpson alleged that "the quality of his representation fell below the legal standard for effective assistance of counsel. As a result of his attorneys' conflict of interest, and their ineffective assistance, Mr. Simpson is requesting that this Honorable court vacate his conviction and sentence." He then proceeds to contend only that "Attorney Anderson's failure to address the medication issue was a way of explaining Mr. Simpson's bail testimony amounts to ineffective assistance of counsel" and that "Mr. Anderson's representation ' * * * fell below an objective standard of

reasonableness.'" Because Simpson has not raised this contention on appeal, we need not resolve this disparity or address it further.

**8.** Aside from the testimony of Simpson and "six pages of applicant's medical records" attached to Simpson's postconviction application, at his postconviction hearing, Simpson only proffered to support his contention with a transcript of his bail hearing testimony and what he described as a "supplemental answer by the State to a discovery request."

**9.** Simpson testified that he was worried that "there was a possibility of maybe I was guilty to a certain extent" in regard to the Roe allegations and, thus, did not want to testify about them.

sion when he [Brousseau] got upstairs he was going to ask the judge to appoint someone else to the case." When the hearing resumed, however, Simpson claims that Brousseau "all of a sudden" called him to testify.

Simpson also testified that he wrote to Casparian, the state Public Defender, asking for the assignment of new counsel because "there was a total breakdown in lawyer-client relationship" and "[t]here was no way I was going to talk to Mr. Brousseau again, and could he please appoint another lawyer." [10]

After Anderson was assigned to take over Simpson's case, Simpson says he told Anderson that he wanted his bail hearing testimony suppressed before his trial began because he had testified while "under duress and under medications at the time." He also alleges he told Anderson that he wanted the charges related to Doe and Roe to be severed and tried separately. According to Simpson, Anderson rejected these requests because Brousseau and he "worked together" and Anderson was "more concerned with protecting Mr. Brousseau and his office than he was in protecting me." Simpson testified that he did not pursue these requests further and retained Anderson as his counsel only because of circumstances that arose following his arrest on another and new sexual assault charge shortly before trial:

> "Q: So what did you discuss about—did you have any discussion with Mr. Anderson about what to do about that situation?
>
> "A: Yes. At the time Mr. Anderson said, well, I might be able to get you out so it won't look that bad of you being in

jail, maybe you can start your trial from the street. He told me at the time if you can forget about the situation as far as the suppression part and the suppression and medication part with Mr. Brousseau, I'll be able to get you out of here. It doesn't look good, but I'll do my best. I was so scared starting my trial because I had no notice or anything I was going to be starting my trial. I was so scared I agreed if you could get me out I would forget it." [11]

Simpson's uncorroborated account of his interactions with both Brousseau and Anderson is flatly contradicted by other evidence that we discern in the record. The record demonstrates unequivocally that on multiple occasions Brousseau advised Simpson that he should not testify at the bail hearing. In addition, Simpson himself acknowledged under oath that Brousseau had advised him not to testify on the day before the bail hearing and, as well, on the morning of the bail hearing. The following colloquy took place during direct examination of Simpson at the post-conviction hearing:

> "Q: Did you make that known to Mr. Brousseau?
>
> "A: Yes, I did.
>
> "Q: Did he tell you that you shouldn't testify at all at that bail hearing?
>
> "A: He told me that I shouldn't testify at the bail hearing, yes.
>
> * * *
>
> "Q: What was said between you and Mr. Brousseau in the cellblock [sic] the first time you talked to him that day about your testimony?

10. Simpson's alleged letter to Casparian does not appear in the record.

11. Simpson was arrested prior to trial after allegedly breaking into a friend's house at

4:45 a.m. and attempting to sexually assault another woman.

"A: I asked him what, was Mary [Roe] coming to testify? He said he hadn't seen her, and as far as he knew, she wasn't coming, so I told him down [sic] I still wasn't going to testify against both, but if I had to, the only way I would testify, I would testify against Jane, I would like to leave that open as an option.

"Q: What did he say to that?

"A: He says that he didn't think I should testify, but something to the extent that if I want to, I would have to sign a piece of paper.

"Q: Did you sign it?

"A: Yes, I did."

The record also contains Simpson's signed declaration, acknowledging that he wanted to testify at the bail hearing and that Brousseau had advised against his doing so. Although the record does show that Simpson, some two weeks before the bail hearing, had been prescribed two medications for his back, Robaxin and Naprosyn, there is no other evidence in the record—other than Simpson's testimony— to establish that Simpson was taking that medication at or around the time of the bail hearing or that such medication, whenever it had been taken, had produced the debilitating side effects Simpson now alleges.[12] Furthermore, Simpson testified at the postconviction hearing that he was not certain that he had even informed Brousseau concerning the type of medication that he was taking.

Brousseau also testified at the postconviction hearing. He stated that Simpson testified at the bail hearing against his advice. He explained that he repeatedly had advised Simpson not to testify and that the bail hearing transcript would be available later during Simpson's trial and could be used for purposes of impeachment to contradict Simpson's trial testimony should Simpson elect to testify. Brousseau also testified that Simpson never brought to his attention that he was on prescription medication or felt lightheaded as a result of taking any medication. As noted earlier, Simpson himself admitted that he was uncertain about whether he had told Brousseau what medication he was taking.

12. Simpson testified at his sentencing hearing that a "nurse" at the Intake Center provided him with "medication" on the morning of the hearing. Simpson, however, did not call this nurse to testify at his postconviction hearing. Simpson also testified at his postconviction hearing that "prison officials" administered Robaxin to him once in the morning and once in the evening. However, no "prison official" was called to testify by Simpson at the postconviction hearing.

At the postconviction relief hearing, there was no expert medical testimony presented to establish that the medication, particularly Robaxin, produced the side effects that Simpson had alleged, because his attorney James T. McCormick (McCormick) said "frankly, I don't feel it's necessary." McCormick informed the court only that he wished to introduce the *Physician's Desk Reference* as an exhibit during the hearing to corroborate Simpson's claims that Robaxin made him feel dizzy and lightheaded. However, this exhibit was not introduced. Pursuant to Rule 803(18) of the Rhode Island Rules of Evidence statements contained in a learned treatise first established as a reliable authority in the field of medicine may then be "read into evidence but may not be received as exhibits."

In his application for postconviction relief, Simpson has attached six pages of the Corrections Department medical records, which show that Simpson had been seen by a physician for a muscle spasm, apparently a lingering consequence of a stabbing that had occurred in 1981. Among other prescriptions, Simpson had been prescribed 500 mg Robaxin and 375 mg Naprosyn on August 30, 1988, and again on October 6, 1988. On November 17, 1988, Simpson was prescribed 750 mg Robaxin and 375 mg Naprosyn. The last prescriptions were prescribed weeks before his bail hearing.

Anderson also testified at the postconviction hearing. He testified that he could not recall any conflict of interest that existed when he represented Simpson at trial. He emphatically denied that any "conflict of interest" ever existed between his representation of Simpson and his affiliation with the public defender's office:

"Q: Did you feel that the public defender's office may have had a conflict of interest in continuing to represent Mr. Simpson?

"A: No. In fact, I felt good about the case, to be honest with you. I thought, I believed Mr. Simpson and I had a good relationship. I thought perhaps that we did have a good shot at trial. The jury was out a couple of days, and only after the verdict did I first hear Mr. Simpson was going, thinking of making a complaint against me." [13]

Anderson denied that he was asked to, or that it would have been possible, to have had Simpson's bail hearing testimony suppressed before Simpson's jury trial. He did testify that the prosecutor had informed him that he would not use the bail hearing testimony at the trial during the prosecution's case-in-chief, but would use it only to impeach Simpson if Simpson elected to testify at his trial. Anderson testified that Simpson wanted to testify at his trial and that he did not disagree with Simpson's decision, particularly because as Anderson explained, Simpson might help himself by giving a "coherent account." He did, however, warn Simpson that the

prosecutor could use the bail hearing transcript to impeach his credibility.

The record establishes that Anderson did attempt to mitigate the anticipated effect of Simpson's earlier bail hearing testimony by suggesting during his questioning of Simpson on direct examination that Simpson at the bail hearing had never been given the opportunity to tell his side of the story to Brousseau before testifying.[14] Anderson later attempted to explain away the discrepancies in Simpson's bail hearing testimony by telling the jury in his closing argument that Simpson "wasn't feeling well" and that "[h]e was on medication" on the day of the bail hearing.

Yet, Anderson testified that, even if he had known more about Simpson's claim of being under the influence of medication, he still was not "going to focus on that for a couple of reasons." He explained:

"One, I didn't want to draw the jury's attention to his former testimony because it was somewhat inconsistent. And two, I think a fair reading of the transcript will sustain me here, the bulk of the jury's attention was on his version of the events of that night."

Anderson additionally testified that he believed that at Simpson's jury trial the impact of any inconsistencies between Simpson's bail hearing and his trial testimony had been mitigated by the prosecutor's fast reading of certain portions of Simpson's bail hearing testimony during his cross-examination of Simpson.[15] The

---

13. The jury returned a verdict during its second day of deliberations.

14. Anderson asked Simpson the following questions on direct examination:
 "Q: Mr. Simpson, have you ever told your side of the story in public before?
 "A: No. This is the first time.
 "Q: Did you, on a prior occasion, back in December of 1988, had testified before a judge but not a jury?

"A: Yes.
"Q: And was I your lawyer at that time?
"A: No, you weren't.
"Q: Had you told the lawyer you had then the details of your side of the story?
"A: No, I did not."

15. Anderson asserted that the formal charges against Simpson were so related that "there was never any question of severance."

trial justice had in fact twice asked the prosecutor to "slow down," during his reading of those transcript portions.

After considering all the evidence introduced at the postconviction hearing and, as well, passing upon the credibility of the various hearing witnesses, a Superior Court trial justice rejected Simpson's contentions and, on December 19, 1999, denied his application for postconviction relief. He specifically found that Simpson had failed to show by a preponderance of the hearing evidence that there was any actual conflict of interest that existed between Brousseau and Anderson that might adversely have affected Simpson's federal constitutional right to effective assistance to counsel. In reviewing the testimony of Brousseau, Anderson, and Simpson, the only witnesses who testified at the postconviction hearing, the hearing justice concluded that both Brousseau and Anderson, because of the passage of time, "had little direct memory of the events complained of by Simpson," and that he was clearly neither impressed nor persuaded by Simpson's testimony. Concerning Simpson's testimony he said:

"Here, of course, Simpson's testimony before this Court, if believed, would create a situation where Public Defender Anderson would have been protecting his colleague at the expense of his client and under case law would have been breaching his duty of undivided loyalty to his client, Simpson.

Further, the case cited by petitioner by Simpson, [Cu]yler v. Sullivan found at 100 Supreme Court 1708 which is also 446 U.S. 335, [64 L.Ed.2d 333] 1980, seems to make clear that such a per se violation of the fundamental right to effective counsel mandates post-conviction relief. However, here petitioner has failed to show by a preponderance of the evidence that there was an actual conflict which adversely affected his constitutionally guaranteed rights to counsel. Put simply, the Court is not satisfied that petitioner has established by a preponderance of the evidence that Public Defender Anderson had divided loyalties. Thus the Court finds that Simpson has failed to establish what I will call a per se violation of his mentioned right to counsel."

The postconviction hearing justice also found that there had been no credible evidence introduced to support Simpson's contention that at Simpson's bail hearing and at his trial, his attorneys had committed any errors that individually or collectively could amount to ineffective assistance of counsel and that, even if the attorneys did err, those errors did not, in any material way, prejudice Simpson. He explained that:

"In review of the record and case at bar [sic] is devoid of evidence that in fact counsels [sic] made errors. To suggest, as has been suggested, that counsel should have required a bifurcated bail hearing on its face to this Court is preposterous. To suggest that the testimony at the bail hearing could have or should have been excluded against [sic] strains credulity so far as this Court is concerned."

He also determined that, although there was some evidence indicating that Simpson had in the past taken prescription medication, there was no credible evidence introduced that established that Simpson had taken such medication at or around the time of the bail hearing or that such medication produced the lightheadedness, memory loss, or any incapacity alleged by Simpson. In fact, according to the medical records introduced by Simpson, he had last been prescribed Robaxin and Naprosyn two weeks before the December 1988 bail hearing. Thus, the hearing justice

found "beyond a question" that the record before him left no question in his mind about the sufficiency of the trial evidence to convict Simpson and that the guilty verdicts returned by the trial jury were based entirely upon that evidence, and not because of any ineffective assistance of counsel.

On appeal to this Court, Simpson contends only that the postconviction hearing justice erred by declining to find that Simpson had been "denied effective assistance of counsel" because of what he alleges constituted a *per se* conflict that existed between the two public defenders, Anderson and Brousseau, and that he further argues "precluded the use of trial strategy at appellant's [Simpson's] trial." It appears that Simpson actually asserts here two related contentions: (1) that a *per se* inherent conflict of interest existed, in violation of his federal Sixth Amendment right to effective assistance of counsel, because one public defender would have been required to argue at his jury trial the incompetency of another public defender from the same office; and (2) that a conflict of interest did in fact exist between Brousseau and Anderson and that conflict also amounted to a violation of his Sixth Amendment right to effective assistance of counsel.[16] He contends that, as a result of this *per se* and actual "conflict of interest," his defense at trial was adversely affected because Anderson had neglected to move to suppress or exclude his bail hearing testimony from being used at his trial and, "more realistically," failed to adequately explain away the inconsistencies in his bail hearing testimony during Simpson's case-

in-chief.[17] For the reasons explained hereinafter, we reject all of these contentions.

## II

### Standard of Review

■■■■ We begin by reiterating the standard we employ when reviewing a hearing justice's decision rendered following a hearing on an applicant's postconviction relief application. Under § 10–9.1–1(a)(1), postconviction relief is available to an individual convicted of a criminal offense, who contends, *inter alia*, that his conviction or sentence was in "violation of the constitution of the United States or the constitution or laws of this state." The hearing justice's findings "are entitled to stand undisturbed on appeal in the absence of clear error or a showing that material evidence was overlooked or misconceived." *Heath v. Vose*, 747 A.2d 475, 477 (R.I.2000), (quoting *Beagen v. State*, 705 A.2d 173, 176 (R.I.1998)). However, "the ultimate determination concerning whether [a defendant's] constitutional rights have been infringed must be reviewed *de novo*." *Powers v. State*, 734 A.2d 508, 514 (R.I.1999) (citing *Ornelas v. United States*, 517 U.S. 690, 696–97, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911, 919 (1996); *Broccoli v. Moran*, 698 A.2d 720, 725 (R.I.1997); *Mastracchio v. Moran*, 698 A.2d 706, 710 (R.I.1997)).

■■■■ In carrying out our *de novo* review, however, we acknowledge that, in the context of reviewing an alleged violation of a defendant's constitutional rights, "a reviewing court should take care * * * to review findings of historical fact only for clear error and to give due weight to infer-

---

**16.** It is not entirely clear whether Simpson's brief makes both these contentions or merely that a particular conflict of interest existed between Brousseau and Anderson. Nevertheless, to ensure that Simpson is fully heard, we address both contentions in this opinion.

**17.** Such potential grounds for exclusion or explanation centered on why "[Simpson] was called to testify at the bail hearing" and "why the court was not informed about the appellant's complaints of not feeling well due to the prescribed medications that he was taking."

ences drawn from those facts * * *." *Ornelas,* 517 U.S. at 699, 116 S.Ct. at 1663, 134 L.Ed.2d at 920; *see also Broccoli,* 698 A.2d at 725; *Mastracchio,* 698 A.2d at 710; *LaChappelle v. State,* 686 A.2d 924, 926 (R.I.1996). Therefore, although we review *de novo* Simpson's postconviction appeal challenging the hearing justice's ultimate determination that Simpson's Sixth and Fourteenth Amendment federal constitutional right to the effective assistance of counsel had not been violated, we do give appropriate deference to the historical fact findings made by the hearing justice.

Our *de novo* review of the hearing record now before us, convinces us that Simpson's constitutional right to the effective assistance of counsel, both at his bail hearing and jury trial, was not violated by any conflict of interest on the part of the two assistant public defenders, one of whom represented Simpson at his pretrial bail hearing and the other of whom represented him at his jury trial. We proceed to explain our basis for so concluding.

## III

### Ineffective Assistance of Counsel Because of Conflict of Interest .

The Sixth Amendment to the United States Constitution provides, in pertinent part, "In all criminal prosecutions, the ac-cused shall enjoy the right * * * to have the assistance of counsel for his defense." In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court held that ordinarily two factors must be shown to reverse a conviction or sentence for ineffective assistance of counsel under the Sixth Amendment:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

However, in more extraordinary contexts, including wherein an attorney is alleged to have had a "conflict of interest," the Court utilizes a different framework for determining a violation of the Sixth Amendment's guarantee to effective assistance of counsel.[18] Under *Cuyler v. Sulli-*

---

**18.** The Court reasoned in *Strickland:*

"In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. * * * Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost.

"One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan,* 446 U.S., at 345–350, [100 S.Ct. 1708] the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, * * * it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest." *Strickland*

*van,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333, 346–47 (1980), the Court explained that the mere "possibility" of a conflict of interest is not enough to impugn a criminal conviction under the Sixth Amendment and rejected the contention that a criminal defendant is entitled to a reversal of his or her conviction whenever he or she makes "some showing of a possible conflict of interest or prejudice, however remote * * *." Instead, the Court required that a criminal defendant who had raised no objection at trial[19] must demonstrate that his or her attorney " 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696; *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718, 64 L.Ed.2d at 346–47.

The Court has emphasized that an "actual" conflict of interest is one that requires that an attorney " 'struggle to serve two masters.' " *See Cuyler,* 446 U.S. at 349, 100 S.Ct. at 1718, 64 L.Ed.2d at 347. As part of this analysis, the Court has looked to determine in the individual case whether the attorney's actions were motivated by divided loyalties and whether the attorney's conduct lacked a "sound strategic basis." *See, e.g., Burger v. Kemp,* 483 U.S. 776, 784–85, 107 S.Ct. 3114, 3120–21, 97 L.Ed.2d 638, 651 (1987). "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate

for his claim of ineffective assistance." *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719, 64 L.Ed.2d at 347.

After a finding of an "actual" conflict, the United States Supreme Court has also required an additional showing of "impairment" or "harm" to the defense, although "prejudice" need not be demonstrated. *See Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719, 64 L.Ed.2d at 347; *see also Burger,* 483 U.S. at 785, 107 S.Ct. at 3121, 97 L.Ed.2d at 652.

In *State v. Feng,* 421 A.2d 1258, 1272 (R.I.1980), in applying *Cuyler* for the first time, we rejected an argument by a defendant that his conviction should be reversed because his counsel represented interests potentially in conflict with his own interests at plea and sentencing hearings. In doing so, we reasoned that the "mere possibility" that his attorney might have had a conflict of interest in representing multiple defendants is insufficient to establish a violation of the Sixth Amendment. *See Feng,* 421 A.2d at 1272. Instead, we held that the defendant would need to establish an actual particular conflict to constitute a violation of the constitutional guarantee of effective assistance of counsel. *See id.* We recently reaffirmed that holding in *Toole v. State,* 748 A.2d 806, 808 (R.I.2000).

In this case, Simpson first contends that "where a public defender is required to argue the incompetency of another public defender in the same office, then there is a per se conflict of interest, which results in

---

*v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674, 696 (1984). Yet, the Court cautioned that "[e]ven so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above." *Id.* at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696.

19. When a defendant makes a timely objection at trial, alleging a conflict of interest based upon multiple representation, the Su-

preme Court has held that a state trial court must investigate whether the defendant's Sixth Amendment rights are being violated. *See Cuyler v. Sullivan,* 446 U.S. 335, 346, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333, 345 (1980). Here, in a context other than multiple representation, Simpson made no timely objection regarding any conflict of interest at trial and his postconviction relief counsel has not raised that issue in this appeal.

a denial of a client's right to counsel." As part and parcel of Simpson's automatic and immediate conflict of interest claim, he asserts that "even the appearance of such an impropriety * * * should require a per se application and finding of ineffective assistance of counsel." We disagree.

We dispute as a threshold matter that an "actual" conflict immediately arises under the Sixth Amendment simply because one assistant public defender is called upon to have a client's potentially damaging pretrial testimony excluded when that testimony is alleged to have been brought about by the alleged ineffective assistance of another public defender. It is simply not enough for a defendant to argue that merely because the attorneys are from the same public defender's office that they have a *potential* for a conflict of interest. That fact alone will not automatically trigger the violation of a defendant's Sixth Amendment right to effective assistance of counsel. On the contrary, as we have earlier noted, both the United States Supreme Court and this Court have consistently refused to recognize hypothetical or speculative conflicts of interest as constituting violations of Sixth Amendment rights. *See, e.g., Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719, 64 L.Ed.2d at 348; *Feng*, 421 A.2d at 1272. Instead, in order to determine the existence of an "actual" conflict of interest, we are required to find that an attorney be motivated to serve "two masters" and to lack a sound strategic basis for his conduct. *See Burger*, 483 U.S. at 784, 107 S.Ct. at 3120–21, 97 L.Ed.2d at 651.

It is far from axiomatic that a public defender would have *per se* divided loyalties between protecting the reputation of his or her office or that of a colleague and between serving his or her client. Several jurisdictions, in fact, had the occasion to consider that precise issue and have concluded, under state ethic rules, that an inherent "conflict of interest" does not exist when one assistant public defender in post-trial proceedings is called upon to challenge the effective assistance of counsel given by an attorney from the same public defender's office at a defendant's earlier trial. *See, e.g., People v. Banks*, 121 Ill.2d 36, 117 Ill.Dec. 266, 520 N.E.2d 617, 621 (1987); *State v. Lentz*, 70 Ohio St.3d 527, 639 N.E.2d 784, 786 (1994). These courts have rejected the contention that in such circumstances, the public defender naturally labors under conflicting loyalties between loyalty toward his client and loyalty toward his office. *See Banks*, 117 Ill.Dec. 266, 520 N.E.2d at 620; *Lentz*, 639 N.E.2d at 786. The Illinois Supreme Court, in *Banks*, in deciding three consolidated appeals all stemming from the common question whether a defendant is entitled to appointment of counsel other than a public defender when the defendant challenges the effectiveness of assistance rendered by an attorney from the same public defender's office, concluded that:

"Defendants nevertheless maintain that here a public defender's loyalty towards the reputation of his office is of such magnitude that a *per se* conflict of interest rule should apply whenever an assistant public defender asserts the incompetency of another assistant. We disagree. To begin, it is not clear to us that where an assistant public defender asserts the incompetency of another assistant, the reputation of the whole office is negatively impacted. To the contrary, it can be equally argued that a positive image is fostered where an office aggressively pursues allegations made against some of its members. More importantly, however, a *per se* rule would require us to presume that public defenders would allow any office allegiances to interfere with their foremost obligation to their clients. In our view,

it is erroneous to assume that public defenders have such an allegiance and are unable to subordinate it to the interests of their clients." *Banks,* 117 Ill. Dec. 266, 520 N.E.2d at 620.

The Ohio Supreme Court also reasoned in *Lentz* that a public defender's office would be more likely than a private firm to raise allegations of incompetence in its own office because it lacked similar financial incentives to retain the client's business. 639 N.E.2d at 786.[20]

Employing the Ohio Supreme Court's approach, a case-by-case inquiry must always be conducted to determine whether any actual conflict of interest exists when an assistant public defender asserts that another public defender has given ineffective assistance. *See Banks,* 117 Ill.Dec. 266, 520 N.E.2d at 621; *Lentz,* 639 N.E.2d at 786. In this case, that was done, and simply because Simpson does not savor the result, that does not, without more, entitle him to the relief he seeks.

Several other courts, we acknowledge, have determined the existence of an inherent "divided loyalty" when a public defender is retained to appeal directly from a criminal conviction, or to assert postconviction relief, when the ground relied upon for the relief sought is that another public defender has given ineffective assistance of counsel at trial. These courts, it should be noted, have found an "inherent" conflict of interest under particular state ethics rules, not under the Sixth Amendment to the United States Constitution. *See Hill v. State,* 263 Ark. 478, 566 S.W.2d 127, 127 (1978) (per curiam) (reversing

and remanding denial of postconviction relief after public defender of Pulaski County represented defendant in postconviction proceedings who had asserted as basis for relief the ineffective assistance of another public defender from same office at trial); *McCall v. District Court for the Twenty–First Judicial District,* 783 P.2d 1223, 1228 (Colo.1989) (adopting *per se* disqualification rule and requiring withdrawal of public defender office's appellate division from representing a person who in seeking appellate relief from a judgment of conviction on the ground that a deputy public defender provided ineffective assistance of counsel in the trial court); *Adams v. State,* 380 So.2d 421, 422 (Fla. 1980) (per curiam) (disqualifying public defender's office from nineteenth judicial circuit from representing defendant in postconviction proceedings alleging ineffective assistance of counsel from same office during trial). Under similar circumstances, the Colorado Supreme Court in *McCall,* 783 P.2d at 1228, had also noted that:

> "We believe that requiring a member of the appellate division to argue that a local deputy public defender rendered ineffective assistance of counsel would have an inherently deleterious effect on relationships within the public defender system and would be destructive of an office upon which the criminal justice system relies to provide competent legal services to indigent defendants. Moreover, notwithstanding the vigor and skill with which the appellate division attorney might present the ineffective assis-

**20.** *Banks* also contended that any *per se* rule of exclusion would "needlessly disqualify competent and able members of the public defender's office." *People v. Banks,* 121 Ill.2d 36, 117 Ill.Dec. 266, 520 N.E.2d 617, 620 (1987). In a concurrence in *Banks,* the chief justice also raised the specter that "the appointment of outside counsel every time there

is a bare allegation of ineffectiveness on the part of the public defender's office could invite claims of incompetency of counsel by petitioners who, for reasons only self-serving, want counsel other than from the public defender's office." *Id.* 117 Ill.Dec. 266, 520 N.E.2d at 622 (Clark, C.J. concurring).

tance of counsel argument, the conflict of loyalties inherent in the attorney's role would make the quality of his or her representation, and thus the fairness and impartiality of the appellate process, necessarily suspect in the public eye. This would derogate from the prescription * * * that '[a] lawyer should avoid even the appearance of professional impropriety.' "

Yet, the *McCall* court acknowledged that an inherent conflict of interest may not be present in every circumstance when a public defender is called upon to assess the ineffectiveness of another public defender. As that court aptly noted:

"We wish to stress the limitation of our holding. The case before us involves only one type of conflict of interest—the representation by the appellate division of a person who in seeking appellate relief from a judgment of conviction asserts that a deputy public defender provided ineffective assistance of counsel in the trial court. The types of possible conflicts of interest that the public defender may encounter in representing persons accused of crimes are myriad. The standards for evaluating conflicts other than the type at issue in the present case, and the remedies to be adopted should conflicts be found to exist, must be considered as the occasions arise and should be tailored to fit the particular circumstances." *McCall*, 783 P.2d at 1229.

Indeed, in some of those jurisdictions wherein a *per se* conflict rule had been applied, those same appellate courts have not forbidden a public defender from participating in post-conviction activity asserting the ineffectiveness of another public defender if they are from different branch offices. *See Hill*, 566 S.W.2d at 127 ("remanded for appointment of counsel who is not associated with the public defender of Pulaski County to represent appellant during his postconviction proceedings"); *Adams*, 380 So.2d at 422 (authorizing the public defender's office of the Fifteenth Judicial Circuit to be appointed to represent defendant in postconviction proceedings alleging ineffective assistance of counsel of the public defender's office of the Nineteenth Judicial Circuit).

In this case, Simpson has not alleged a violation of any particular state ethical rule or of any specific provision in our state constitution. Accordingly, we need not assess whether the mere interaction of the two public defenders in this case constituted a "conflict of interest" that might have impinged upon any right guaranteed him by our state constitution. *See* § 10–9.1–8; Sup.Ct.R.16; *Canario v. Culhane*, 752 A.2d 476, 478 (R.I.2000). We need only to address Simpson's specific appellate contention namely that the purported "conflict of interest" served to violate his right to the effective assistance of counsel guaranteed him by the Sixth and Fourteenth Amendments to the United States Constitution.[21]

---

**21.** The only case dealing with public defender conflicts that Simpson cites to is *People v. Thompson*, 132 Ill.App.3d 335, 87 Ill.Dec. 555, 477 N.E.2d 532 (1985). He cites to it for the proposition that an inherent violation of an individual's Sixth Amendment right to effective assistance of counsel exists when "a public defender is required to argue the incompetency of another public defender who works in the same office." We note that the Illinois appellate court found a conflict of interest only after considering that the second public defender, the one required to argue the incompetency of the first, was actually appointed to represent the defendant by the first public defender and, thus, "[u]nder these circumstances, the record indicates a connection between [the public defenders] * * * sufficient to find a conflict of interest." *Thompson*, 87 Ill.Dec. 555, 477 N.E.2d at 533. The court also emphasized that this "close connection" created an "appearance" of impro-

This is not to be interpreted as meaning that we are relaxing the ever-present need for our judicial oversight in matters pertaining to allegations of conflicts that might impinge upon a defendant's constitutional right to the effective assistance of his or her counsel. All we are saying here is that we will continue to oversee those claims on a case by case inquiry so we will be able to ferret out those real or actual conflicts from those that are purely speculative. This approach is an accord with the United States Supreme Court's Sixth Amendment jurisprudence.[22]

## IV

### The Appellate Contentions

 Simpson's first postconviction contention is that he was essentially forced by Brousseau to testify at his bail hearing. That contention is refuted in the record by the written acknowledgment signed by Simpson in which he admits that he was advised by Brousseau not to testify at the hearing as well as by the testimony of Brousseau and Simpson himself. Simpson's ancillary claim is that on the day that he testified he had told Brousseau that he was then under the influence of pain pills prescribed for him at the Adult Correctional Institutions, which impaired his mental ability to testify, and thus Brousseau should not have permitted him to testify. Simpson offered no evidence to support that claim, other than his own testimony. The medical personnel who prescribed that medication, Robaxin and Naprosyn, all are identified in the record and all were available to testify, but Simpson did not call on them to do so. The burden of proving his postconviction contentions was Simpson's, and he failed to do so. Interestingly, the record does show that those medications had been prescribed two weeks before the bail hearing. The number of pills given Simpson—when he took them—the length of any material side effects resulting therefrom—were all left to pure speculation. The trial justice, we conclude, committed no error in finding that Simpson had failed to meet his burden of proof about those allegations made against Brousseau.

 Simpson's postconviction allegations of ineffective assistance asserted against Anderson are viewed from the hearing record as even more wanting in substance than those made against Brousseau. Little, if any, credible evidence supports Simpson's assertion that Anderson attempted to "protect" his colleague at the public defender's office. Aside from Simpson's testimony, which the trial justice found not to be credible, there was no other testimony or evidence introduced to show that Anderson was motivated by "divided loyalties" or that he "actively represented conflicting interests." On the contrary, testimony provided by both Anderson and Brousseau, as well as other hearing evidence, demonstrates that Anderson was properly motivated out of a desire to serve his client.

priety. *Id.* 87 Ill.Dec. 555, 477 N.E.2d at 534. Nevertheless, *Thompson* fails to specifically point to the Sixth Amendment in the case and it appears in any event to be overruled by *Banks,* decided two years later in 1987.

22. We briefly note that on Simpson's first point of error, even assuming the two public defenders in the same office to have an "actual" conflict of interest, there is no assertion in this point of error that the "conflict" adversely affected Simpson's representation. Rather, Simpson's claim appears to be that since an inherent *per se* "conflict" exists when an assistant public defender is called upon to question the competency of another, no further inquiry is necessary in order to establish harm to the defense. This is a concept unfamiliar to Sixth Amendment jurisprudence.

Indeed, Anderson appears to have employed a sound tactical basis for making the trial strategy judgments that are now called into question by Simpson. Although Simpson appears to concentrate his challenge to Anderson's trial strategy for not seeking to have the bail hearing testimony excluded, Anderson denied that Simpson had ever asked him to make a motion to strike the testimony. Anderson also had been advised by the prosecutor that the bail hearing testimony would not be used in the prosecutor's case-in-chief, but only for impeachment purposes if Simpson testified. Simpson had been advised of the prosecutor's intentions. It was Simpson's decision to testify at trial, and he voluntarily chose to do so. He made that decision and must abide by its consequences.

 We agree with the trial justice that, "To suggest that the testimony at the bail hearing could have or should have been excluded against [sic] strains credulity so far as this Court is concerned." Virtually no chance existed that a motion *in limine* or motion to suppress would have been granted on the ground of "unfair surprise" by Simpson. The trial court had been presented with, *inter alia,* a signed declaration by Simpson acknowledging that he wished to testify at his bail hearing and sparse evidence that Simpson was laboring under the effect of any medication. Simpson's bail hearing testimony under any normal circumstances was clearly admissible at trial for purposes of impeachment. *See* Rhode Island Rules of Evidence 613 and 607.

Although Simpson also criticizes Anderson for his failing at trial to attempt to "explain or mitigate the damaging effects of the bail hearing testimony by either presenting testimony, witnesses or pretrial motions," he offers no real suggestion about how Anderson would have been able to conceal the incriminating and con-tradictory bail hearing testimony from the trial jury. He obviously overlooks the fact that Anderson is a lawyer, not a magician. It appears from the record that Anderson made sound strategic trial choices to avoid the full impact of Simpson's bail hearing testimony and to de-emphasize Simpson's testimonial inconsistencies.

In short, we agree with the trial justice's finding that that Simpson failed to establish "by a preponderance of the evidence that Public Defender Anderson had divided loyalties." Since we conclude that no "actual" conflict existed, we need not address any alleged "harm" to Simpson's defense.

## V

### Conclusion

For the foregoing reasons, we deny Simpson's appeal. The judgment denying his application for postconviction relief is affirmed. The papers of this case are remanded to the Superior Court.

Chief Justice WILLIAMS did not participate.