STATE

v.

Maria J. PINEDA.

No. 2009–53–C.A.

Supreme Court of Rhode Island.

March 2, 2011.

Christopher R. Bush, Department of Attorney General, for State.

George J. West, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

The defendant, Maria J. Pineda (defendant or Pineda), appeals from her convictions for felony assault with a dangerous weapon, G.L.1956 § 11–5–2, and disorderly conduct, G.L.1956 § 11–45–1. Pineda contends that the trial justice erred when he (1) declined to instruct the jury on self-defense, (2) failed to inform her that she was entitled to individual counsel separate from her codefendant or to inquire into the specific conflicts of interest potentially caused by their joint representation, (3) denied her motions for a judgment of acquittal, and (4) denied her motion for a new trial. After reviewing the record and considering the parties' oral arguments, we affirm the judgment of the Superior Court for the reasons set forth in this opinion.

## I

### Facts and Procedural History

On or about September 17, 2003, Jose Pineda (Jose),[1] defendant's brother, was visiting his friend Keith Souza (Souza) and Souza's girlfriend, Elizabeth Rodrigues (Rodrigues), at Souza and Rodrigues's shared Pawtucket apartment (the Rodrigues apartment), when their conversation devolved into an argument over an audio tape in Souza's tape recorder. Later, after Souza discovered the tape missing, he called Jose to inform him that he was not welcome at the Rodrigues apartment until the tape was returned. Despite Souza's request, Jose returned to the residence three times between the evening of September 19, 2003, and the early morning hours of September 20, 2003. During this period, Jose, Souza, and Rodrigues, each drank alcohol.

Jose first arrived at the Rodrigues apartment on September 19, 2003, around 9 in the evening. Souza told Jose that unless he was going to return the tape, he had to leave. Jose obliged. About an hour later, Jose returned to the residence. On this occasion, Jose and Rodrigues argued about the missing tape, and then Jose again left the premises. Rodrigues testified that, as Jose was leaving this time, he threatened her with the warning that "I'm really going to get my sister. She is going to 'F' you up." Souza also testified that Jose threatened that he was "going to get [his] sister." Antoine L. Marria (Marria), an acquaintance of Jose's who was with him at the Rodrigues apartment, likewise recalled that Jose said that he was going to get his sister and bring her back to the apartment.

Thereafter, Pineda was awakened by Jose ringing her doorbell. Pineda testified that after she spoke with him briefly about the disagreement that he had with Souza and Rodrigues, Jose left. According to Pineda, because she knew Jose was very

---

1. For convenience distinguishing between the two Pineda siblings, Jose Pineda and Marie Pineda, this Court will refer to defendant by her last name, Pineda, and her brother by his first name, Jose. In so doing, we intend no disrespect to either party.

drunk and "[v]ery, very upset" and because she was afraid he would "do something crazy, and very hot headed," she set out looking for him at the Rodrigues apartment. Pineda arrived in her own car, separately from her brother, but close in time. From this point, the accounts recalling the evening's events differ markedly.

Pineda said that upon her arrival at the Rodrigues apartment, she saw Souza hitting her brother with a bat. Pineda testified that she got out of her car to help Jose, when she was hit from behind and pinned to the ground by a female, later determined to be Rodrigues. Pineda explained that Rodrigues had a "stick * * * object" in her hand, and Rodrigues was attempting to hit her with it. According to Pineda, she gave a few kicks to try to free herself and tried to hold the "stick" back, but could not escape until a man pulled Rodrigues off of her. Souza likewise testified that Pineda and his girlfriend, Rodrigues, were "pulling hair and fist fighting." Marria also testified to a fist fight between the two women. Pineda explained that after she was freed from the tussle she saw the "particular stick," which now looked like a "construction tool" to her, on the ground nearby. Fearing that Rodrigues would retrieve the "construction tool" and hit her with it, Pineda recalled that she picked it up, stowed it in her car, and then drove away.

Rodrigues testified to a different version of the fight. She explained that after Jose had left for the second time, she was walking back toward the apartment when a woman, later determined to be Pineda, struck her in the head with a hammer about "seven times." After receiving the first blows from the hammer, Rodrigues recalled, she "[s]tarted fighting [Pineda] * * * punching her, uppercutting her." In the course of the fight, according to Rodrigues, the hammer was dislodged from Pineda's hands and Jose tried to hand it back to his sister. Rodrigues testified that, once the fracas subsided, she called 9–1–1 and explained that Souza needed medical attention.[2]

After Rodrigues's 9–1–1 call, officers from the Pawtucket Police Department were dispatched to the scene and given a description of Jose's and Pineda's cars. First spotting a gold vehicle as described by the dispatcher, Officer Robert Cardente (Officer Cardente) turned on his police cruiser's lights and attempted to make a stop. The gold vehicle, a Ford Taurus, later confirmed to be Pineda's, did not stop; and at trial, Pineda said that she did not see the police lights. Almost immediately after sighting the Taurus, Officer Cardente saw the other vehicle described in the dispatch and successfully made a traffic stop. Officer Michael Kevin Kane, Jr. (Officer Kane) and other police officers arrived as backup, proceeded with traffic-stop protocol, and then arrested Jose, the driver of this second car. As the police were taking Jose into custody, Pineda drove up in her car, yelling that the police were arresting her brother and that she "work[ed] for a lawyer." Thereafter the police also arrested Pineda and seized a two-headed hammer from her vehicle.

Once the traffic stop of Jose's car was secured, Officer Cardente went to the Rodrigues apartment. He testified that upon his arrival, Rodrigues was hysterical and told him that she had been punched by Pineda, but "didn't mention a hammer." Rodrigues disputed Officer Cardente's rec-

---

2. During the fight between Rodrigues and Pineda, there apparently was a separate, contemporaneous physical altercation involving Souza and some other men, who either arrived at the apartment with Jose or who already were there. Souza was injured seriously during this fight, eventually requiring stitches and staples in his head.

ollection, instead recalling that she did tell the first officers on the scene that she was hit several times with a hammer. After speaking briefly with Rodrigues at the apartment, Officer Cardente brought her to the showup of Jose and Pineda, who were in Officer Kane's custody. There, Rodrigues positively identified Pineda as her assailant. According to Officer Cardente, when Rodrigues made the identification, she asserted that Pineda "was the individual who punched her." Rodrigues conversely recalls that at the showup she told the police officers that Pineda was the person who "struck [her] with the hammer several times."

After the showup, the police brought Rodrigues to the police station, where she gave Det. Napoleon Gonsalves (Det. Gonsalves) a statement of the evening's events.[3] Detective Gonsalves recalled that Rodrigues never mentioned being struck repeatedly with a hammer when he was taking her first statement. In accordance with Rodrigues's written statement, Det. Gonsalves testified that Rodrigues only reported that an object "grazed" her person. In her testimony, however, Rodrigues disputed that she used the word "grazed" when describing the incident to Det. Gonsalves that night. According to Rodrigues, she told Det. Gonsalves that she was struck repeatedly with a hammer. She justified the discrepancy between her testimony of the events and the written statement with explanations that Det. Gonsalves was "rude" to her while taking her statement; she was only "somewhat" familiar with the statement before she signed it; and she was dizzy, not feeling well, and in need of medical attention while she was giving her statement, but was denied this request. Basically, Rodrigues testified that Det. Gonsalves made mistakes or manipulated her words when he took her statement at the police station that evening. Detective Gonsalves disputed her contentions, recalling that he followed proper protocol, that he allowed Rodrigues to review the statement before she signed it, and that Rodrigues never communicated her need for medical attention, but rather he remembered her being "very upset" and wanting to go to the hospital to see Souza. However, after looking at photographs taken at the police station that night, Det. Gonsalves did testify that Rodrigues looked like she had been hit in the eye, probably with a hammer.

Rodrigues testified that after her statement was finalized, she again asked to be transported to the hospital and a female officer obliged. While at the hospital, Officer Kane, who had brought Jose to the hospital for medical treatment, approached Rodrigues. He recalled that she told him that "[s]he was hit with a hammer."

Approximately ten days after the incident, on September 29, 2003, Det. Gonsalves picked up Rodrigues at her apartment and brought her to the police station, where she gave a second statement. This statement included Rodrigues's assertion that "[Pineda] struck me about six or seven times in the head."

On March 19, 2004, both Jose and Pineda were charged with assaulting Rodrigues with a dangerous weapon, a hammer (count 1), and disorderly conduct for engaging in fighting, threatening, violent or tumultuous behavior (count 2). At the pretrial hearing on February 24, 2005, Pineda and Jose's shared, private attorney presented the trial justice with a signed

---

3. Rodrigues's first statement is dated September 19, 2003; however, it actually was taken on September 20, 2003, early in the morning.

stipulation[4] requesting joint representation for his clients and waiving any potential conflicts of interest emanating from that arrangement. In open court, their attorney explained to the trial justice that he had discussed the potential for conflicts with Jose and Pineda and did not anticipate that any would arise. The trial justice then asked Pineda and Jose whether they signed the stipulation and also whether they understood that joint representation poses possible conflicts that may "put[ ] a lawyer in a difficult situation where evidence might be helpful to one defendant and harmful to another." He, however, reminded the pair that their attorney did "not foresee an issue arising" with regard to potential conflicts of interest. Upon Jose's and Pineda's confirmations that they understood the potential risks, waived any possible consequences, and had freely signed the stipulation, the trial proceeded before a jury.

After the state had presented its evidence, Pineda moved for a judgment of acquittal. The trial justice denied her motion, and Pineda proceeded with evidence supporting her defense. At the close of all evidence, Pineda again moved for a judgment of acquittal and asked the trial justice to instruct the jury on self-defense. The trial justice declined both requests, but he agreed to instruct the jury on felony assault (with a dangerous weapon) and the lesser included offense of simple assault (without a dangerous weapon) for count 1, as well as disorderly conduct for count 2. On March 1, 2005, Pineda was convicted of felony assault and disorderly conduct.[5]

On April 12, 2005, the trial justice denied Pineda's new-trial motion, finding that this case "principally revolved around [the] credibility of various witnesses," and that he could not "fault" the jury for "opt[ing] to believe * * * Rodrigues['s] version of the events." The trial justice noted that "there were some discrepancies between [Rodrigues's] trial testimony and statements to the police," but he nonetheless concluded that it was not unreasonable for the jury to "accept[ ] the essence of her testimony as truthful." He highlighted other evidence that supported Rodrigues's veracity, as well. Specifically, the trial justice explained that the hammer found in Pineda's car, Jose threatening Rodrigues with retaliation from his sister, and Pineda's avoidance of the police that night further persuaded him that the instant jury verdict was "justified."

Pineda's sentencing occurred on July 18, 2005. The trial justice imposed five years, with nine months to serve, the balance suspended, with probation, on count 1, and six months suspended, with probation, on count 2. The sentences were to run concurrently.[6] The judgment of conviction was entered on September 13, 2005. Pineda filed a notice of appeal on August 4, 2005.[7]

4. The stipulation, signed by Jose and Pineda on December 8, 2004, states: "We, Jose Pineda and Marie Pineda, hereby do voluntarily waive any and all claims of a conflict of interest in/by Attorney Matthew B. Smith representing both of us in this above-referenced criminal case. We both desire that Attorney Matthew B. Smith represent us up to and including a trial in Providence County Superior Court."

5. Although Pineda was convicted of felony assault, the jury found Jose guilty of misdemeanor simple assault.

6. The trial justice sentenced Jose to one year on count 1, with five months to serve, the balance suspended, with probation, and six months on count 2, all suspended, with probation. Jose's sentences were concurrent.

7. Though defendant's notice of appeal was filed prior to the entry of the final judgment of conviction, "[t]his Court has stated that it will

## II

## Analysis

On appeal, Pineda contends that the trial justice committed four errors: (1) failure to instruct the jury on self-defense, (2) failure to inform defendant of her right to separate counsel or to inquire into the specifics of potential conflicts of interest caused by joint representation, (3) failure to grant her motions for a judgment of acquittal, and (4) failure to grant her motion for a new trial. We address each issue in turn.

## A

### Self–Defense Instruction

■ This Court conducts a *de novo* review of a trial justice's refusal to instruct the jury on self-defense. *State v. Butler,* 107 R.I. 489, 491, 268 A.2d 433, 434 (1970) (If the trial justice "concludes that the requested instruction is not applicable, the effect of the defendant's exception to such ruling is to require this [C]ourt to independently review the evidence and determine whether the trial justice's concept [on self-defense] was correct."). In so doing, we examine the record in a light most favorable to the defendant. *State v. Linde,* 876 A.2d 1115, 1130 (R.I.2005) (citing *State v. Guillemet,* 430 A.2d 1066, 1069 (R.I.1981)). This Court "shall affirm a trial justice's jury instructions when * * * the instructions adequately cover the law and neither reduce nor shift the state's burden of proof." *Id.* at 1128 (quoting *State v. Keiser,* 796 A.2d 471, 472 (R.I.2002) (mem.)).

■ In our jurisdiction, it is well established that a trial justice must present the jury with an instruction on self-defense regardless of how "slight and tenuous the evidence may be on which the self-defense

hypothesis is advanced." *Linde,* 876 A.2d at 1130 (quoting *Butler,* 107 R.I. at 496, 268 A.2d at 436). This Court has held that "individuals believing that they are in imminent peril of bodily harm can use such nondeadly force as is reasonably necessary in the circumstances to protect themselves." *Id.* (quoting *State v. Martinez,* 652 A.2d 958, 961 (R.I.1995)). However, "one may not invoke the doctrine of self-defense if he or she has instigated the combative confrontation." *Id.* (quoting *Martinez,* 652 A.2d at 961). We further acknowledge that it is acceptable to refer to other evidence not specifically elicited from the defendant when examining the record for anything supporting the self-defense theory. *Murphy–Bey v. United States,* 982 A.2d 682, 690 (D.C.2009) ("[E]vidence [related to a theory of defense] may come from either the prosecution or the defense, or a combination of the two.").

## 1

### Pineda's Articulated Self–Defense Theory

■ Pineda was charged with assaulting Rodrigues with a dangerous weapon, a hammer. At trial, Pineda did not testify that she wielded a hammer to protect herself. Instead, she stated that after wresting the hammer from Rodrigues, she picked up the "construction tool," and then ran to her car. More importantly, the self-defense *hypothesis* advanced by Pineda did *not* contend in the alternative that, if the jury did find that Pineda hit Rodrigues with a hammer, it was done in self-defense. Rather, when arguing for the self-defense jury instruction, Pineda's attorney presented the following theory to the trial justice: "as Pineda was being hit

treat a premature appeal as timely filed." *State v. Ruffner,* 5 A.3d 864, 866 n. 4 (R.I.

2010) (quoting *Ballard v. State,* 983 A.2d 264, 266 n. 2 (R.I.2009)).

with the stick [by Rodrigues,] she had attempted to deflect blows, * * * [she] used her right knee on to the back and groin area of * * * Rodrigues, and she was attempting to get * * * Rodrigues off her." The trial justice took exception to the summary of testimony provided by Pineda's attorney and clarified that he heard Pineda testify only that "she suddenly found herself being whacked in the back of the head. She went to the ground * * * [and] kicked a few times trying to get out from underneath [Rodrigues]." Pineda's attorney agreed that the trial justice's summarization "[was] correct" and then contended that "any blows [Pineda] landed were strictly [in] self-defense." After hearing the state's arguments that Pineda was the initial aggressor and that Pineda could not definitely assert that it was Rodrigues who hit her first, the trial justice declared that he was not persuaded by defendant's self-defense theory and found that "[t]here is not a scintilla of evidence in this record that entitles her to such an instruction." We concur.

 It is axiomatic that self-defense excuses or justifies an otherwise criminal assault and battery because the actor fears for her own safety and is entitled to use appropriate force to prevent, avoid, or combat an advancing attacker. *Linde*, 876 A.2d at 1130; *Henson v. State*, 786 N.E.2d 274, 277 (Ind.2003) ("A valid claim of self-defense is a legal justification for an otherwise criminal act."). By definition, unless the self-defense hypothesis presumes that the defendant actually committed the charged assault, the trial court cannot af-

ford the defendant with the prospect of a not-guilty verdict by reason of justification. *State v. Grubb*, 111 Ohio App.3d 277, 675 N.E.2d 1353, 1356 (1996) ("Self-defense is not merely a denial or contradiction of evidence offered by the state * * *. Rather, it is an admission of the prohibited conduct coupled with a claim that the surrounding facts or circumstances exempt the accused from liability[, therefore a] 'justification for admitted conduct.'") (quoting *State v. Poole*, 33 Ohio St.2d 18, 294 N.E.2d 888, 889 (1973)). Essentially, the defendant must assert a hypothesis that encompasses the entirety of the charged crime, and the trial justice must find at least "slight and tenuous" support for that self-defense hypothesis in the record. *Linde*, 876 A.2d at 1130.

 Here, Pineda's proffered hypothesis maintained that she never used the hammer and that her mode of self-defense was kicks and attempts to deflect blows. We certainly agree that this self-defense hypothesis advanced by Pineda has some backing in the presented evidence because the record includes references to Pineda kicking or trying to get Rodrigues off her. However, Pineda was not accused of kicking Rodrigues, a charge that conceivably could have been excused by her self-defense theory. Rather, Pineda was accused of assaulting Rodrigues with a hammer. Even if we assume that she acted in self-defense when she kicked up at Rodrigues, this theory cannot negate the charge: assault with a dangerous weapon, a hammer.[8] *See Murphy–Bey*, 982 A.2d at 690

---

8. Likewise, we decline to credit Pineda's shod-foot self-defense theory offered as her final argument that she was entitled to a self-defense instruction. Pineda explains that our jurisdiction recognizes a "shod foot" as a dangerous weapon, *State v. Bolarinho*, 850 A.2d 907, 908–09, 912 (R.I.2004), and that the instant parties agree that Pineda and others

testified that she kicked at Rodrigues in an effort to escape the fight. She argues that because a shod foot is a dangerous weapon, a jury that found that she was kicking in self-defense would be capable of rendering her not guilty on the charge of assault with a dangerous weapon. Again, the fatal flaw in Pineda's argument is that she was not

("[A] defendant is entitled to a jury instruction on a theory of the case that negates his guilt of the crime charged if the instruction is supported by any evidence, however weak."). Because Pineda's self-defense hypothesis was distinct from the criminal charge she was facing and would not have been legally sufficient to avoid a conviction for assault *with a dangerous weapon,* we hold that a self-defense instruction based upon this theory would have confused the jury and therefore was properly omitted by the trial justice.[9] *See State v. DiChristofaro,* 848 A.2d 1127, 1130 (R.I.2004) ("A self-defense instruction is not warranted, however, when there is no evidence on which a jury could find that the defendant acted in self-defense because such an instruction could mislead or confuse the jury * * *.").

### 2

### Scintilla of Evidence

Furthermore, had Pineda actually articulated a correctly framed self-defense hypothesis (that she used the hammer in self-defense), there was not a shred of evidence in the record to undergird the pivotal point of this theory: that the hammer was used in a self-defensive manner. *See Dorrough v. State,* 812 So.2d 1077, 1081 (Miss.Ct. App.2001) (holding that the defendant was

not entitled to a self-defense instruction on the aggravated assault charge because the defendant testified that "he did not have a weapon" and the other witnesses, who testified that the defendant left the scene to retrieve the weapon and then returned to strike his victim, did not provide requisite support that the defendant used the weapon in self-defense). In the instant case, Pineda maintained that she was struck first, kicked and deflected blows to try to free herself, but that she never used the hammer. Rodrigues's testimony asserted that Pineda was the first aggressor, and that Pineda struck her with six or seven hammer blows. The remaining eyewitnesses likewise provide no support that Pineda hammered Rodrigues in self-defense because each recalls a Pineda–Rodrigues fistfight, not a hammer fight. Even cobbling together all of this testimony, our review of the record does not reveal any evidence that Pineda used the hammer in *self-defense. See Linde,* 876 A.2d at 1130 (requiring that the record contain at least "slight and tenuous" evidence to support the "self-defense hypothesis").

Relying on *Adams v. United States,* 558 A.2d 348 (D.C.1989), Pineda argues that "the scintilla standard do[es] not require that a defendant testify to having used the charged weapon in order

charged with using a shod foot as the dangerous weapon. As such, this theory also fails to address the actual criminal charge she was facing.

9. We pause to distinguish *State v. Butler,* 107 R.I. 489, 493, 268 A.2d 433, 435 (1970), from the instant case. Unlike Pineda, the defendant in *Butler,* 107 R.I. at 493–95, 268 A.2d at 435–36, advanced a self-defense theory that had the possibility of excusing the underlying charge, murder in the second degree, which does not require the commission of the killing to be proven by any particular method or instrumentality. *See* G.L.1956 § 11–23–1. Therefore, when the defendant in *Butler* asserted that she responded to the victim alleg-

edly grabbing her throat with a panicked push that caused the victim to fall and fatally injure his head, she offered an alternate theory and justification why her victim was killed by her actions and why she should not be criminally responsible for second-degree murder. *Butler,* 107 R.I. at 494–96, 268 A.2d at 435–37 (perceiving evidence in the record to support the defendant's self-defense hypothesis and holding that the trial justice should have instructed on self-defense). Here, Pineda did not advance a self-defense hypothesis offering a justifying explanation of her alleged hammer use, an explicit element of the charge of assault with a dangerous weapon.

to gain the instruction." Although we agree that a defendant need not testify that he used the weapon to avail himself of an instruction, we do hold that the record as a whole must contain at least a scintilla of evidence supporting the defendant's theory that he used the weapon in self-defense. In *Adams,* the defendant, who was charged with "assault with intent to kill while armed," adopted a bifurcated trial strategy that advanced inconsistent defenses: in one theory of the case, he argued that he did not use the brass knuckles at all; and in his other theory, he asserted that he was acting in self-defense when he used the brass knuckles. *Id.* at 349. During the trial, the defendant had testified that he was fearful for his own safety so he hit his knife-wielding victim with his bare fist, not the brass knuckles. *Id.* Based on the appellate court's recitation of the record, there was no testimony or other evidence that the defendant used the brass knuckles in self-defense, only that the defendant used the weapon to attack the complainant. *Id.* Relying upon this record, however, the *Adams* court determined that there was "a sufficient factual predicate for a theory of self-defense" on the charge of assault with intent to kill while armed, which required a jury instruction. *Id.* at 350. The *Adams* fact pattern is similar to the instant case, but this Court notes an important distinction. Although the *Adams* court made the logical step from a self-defensive bare-fisted punch to a self-defensive brass-knuckle punch, here we would have to leap from deflecting blows and defensive kicks to self-defensive hammer swings. Because Pineda would be hard-pressed to convince a trial court that she is able to use a hammer with her foot, we maintain that *Adams* is not factually on all fours with the instant case and that there is not a scintilla of evidence in the instant record to support a properly framed self-defense hypothesis.

■ Beyond this factual distinction, we also note that *Adams* is not precedent in our jurisdiction and we are not bound to apply its reasoning categorically. In our view, a self-defense instruction is not appropriate for a charge of assault with a dangerous weapon when the record lacks *any* evidence that the *specific,* charged dangerous weapon was used in a *self-defensive* manner. Adopting a precedent commensurate with *Adams* would permit a defendant to misdirect the jury with self-defense red herrings. We decline to allow such a result. Based on the incongruent self-defense theory proffered by Pineda to the trial justice and the dearth of evidence applicable to a properly articulated theory, we hold that the trial justice did not err when he declined to instruct the jury on self-defense.

## B

## Right to Separate Counsel and the Supervisory Rule

### 1

### Sixth Amendment [10]

### i

### Standard of Review

■ On appeal, Pineda presents the constitutional question of whether her

---

**10.** The Sixth Amendment to the United States Constitution states in its entirety:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor,

Sixth Amendment right to counsel, applicable to this state through the Fourteenth Amendment, was infringed on by her counsel's joint representation of her and Jose. *See Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (holding that "[t]he mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations [to jointly represented clients] have effectively sealed his lips on crucial matters"); *see also Argersinger v. Hamlin*, 407 U.S. 25, 27, 40, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) (recognizing that "[t]he Sixth Amendment, which in enumerated situations has been made applicable to the States by reason of the Fourteenth Amendment" and extending its breadth to any cases in which "actual deprivation of a person's liberty" is at stake). "[T]his Court reviews in a *de novo* manner 'questions of fact concerning whether a defendant's constitutional rights have been infringed, and mixed questions of law and fact with constitutional implications * * *.' " *Page v. State*, 995 A.2d 934, 942 (R.I.2010) (quoting *Ouimette v. State*, 785 A.2d 1132, 1135 (R.I.2001) (applying *de novo* review to an appeal of a denial of an application for post-conviction relief that challenged the defendant's effective assistance of counsel)). Accordingly, we will examine anew the Sixth Amendment constitutional issue presented by Pineda's appeal. *See Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir.1998) ("The question of whether counsel labored under an actual conflict of interest that affected representation is a mixed question of law and fact that we review de novo.").

 Before proceeding, we note that "this Court has consistently explained that we shall only consider a claim of ineffective

and to have the assistance of counsel for his defense."

assistance of counsel on direct appeal if the claim is 'based on specific rulings by the trial justice,' * * * inasmuch as this rule 'is consistent with the fundamental principle that only specific rulings of a trial justice are reviewable on direct appeal.' " *State v. Page*, 709 A.2d 1042, 1046 (R.I. 1998) (quoting *State v. Gonsalves*, 476 A.2d 108, 112 (R.I.1984)). Here, because Pineda's challenge to her counsel's effectiveness stems from the trial justice's approval of her signed stipulation that waived any potential conflicts arising from the joint representation, we are satisfied that Pineda's claim is based on a specific, reviewable ruling of the Superior Court. *See State v. Laurence*, 848 A.2d 238, 241, 252, 253 (R.I.2004) (reviewing, on direct appeal, the effectiveness of counsel based on an examination of whether defendant's waiver of his right to counsel was "voluntary," "knowing and intelligent") (quoting *State v. Thornton*, 800 A.2d 1016, 1025 (R.I. 2002)).

### ii

### Defendant's Argument

 While acknowledging that the trial justice did engage her in a discussion of the garden variety conflicts of interest potentially caused by joint representation, Pineda contends that the trial justice overlooked actual conflicts in her case and instead relied on her attorney's assurances that joint representation was proper because the attorney did not anticipate any conflicts arising. Pineda maintains that when a trial justice ignores actual conflicts that are known or should have been known, a Sixth Amendment violation results and reversal is merited. We agree with her articulation of Sixth Amendment jurisprudence, but disagree that actual[11]

11. In agreeing with Pineda's articulation of applicable precedent, we must note that "[a]n

conflicts were presented by the instant facts and decline to reverse upon this basis.

■ With respect to the effect of joint representation on a criminal defendant's Sixth Amendment right to the assistance of counsel, the Supreme Court of the United States has held that "[i]n order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Toole v. State*, 748 A.2d 806, 807 (R.I.2000) (citing *Cuyler*, 446 U.S. at 348, 100 S.Ct. 1708). We note that without some indication that an actual conflict exists, there is no affirmative requirement that trial justices must delve *sua sponte* into the propriety of the attorney-client relationship. *Cuyler*, 446 U.S. at 346, 347, 100 S.Ct. 1708 (recounting that "nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation * * * [u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry"); *State v. Feng*, 421 A.2d 1258, 1272 (R.I.1980) (holding that " 'trial courts may assume either that multiple represen- tation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist' " unless "special circumstances" indicate that the trial justice should have realized that "a particular conflict" was afoot) (quoting *Cuyler*, 446 U.S. at 347, 100 S.Ct. 1708).

■ Furthermore, even if the trial justice neglects to inquire into a conflict about which he knew or reasonably should have known, a defendant still must establish the existence of an *actual* conflict of interest, i.e. a conflict "that adversely affect[ed] counsel's performance," before reversal is merited. *Mickens v. Taylor*, 535 U.S. 162, 172, 172 n. 5, 173–74, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (holding that the "trial court's failure to make the [*Cuyler*]-mandated inquiry does not reduce the petitioner's burden of proof * * * to void the conviction").[12] Consequently, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 350, 100 S.Ct. 1708 ("[T]he possibility of conflict is insufficient to impugn a criminal conviction."). Our Supreme Court in *Feng*, 421 A.2d at 1272, echoes this precedent stating that a "constitutional claim" cannot be based on the

'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). Accordingly, the requirement that a trial judge "inquir[e] into actual conflict" is not "separate and apart from adverse effect." *Id.* To the extent Pineda argues that a constitutional violation adheres simply because the trial justice did not inquire into potential conflicts, we heartily disagree. *See infra.*

**12.** The concurring opinion in *Mickens*, 535 U.S. at 179, 122 S.Ct. 1237 (Kennedy, O'Connor, JJ., concurring) explains this condition fluently:

"The constitutional question must turn on whether trial counsel had a conflict of interest that hampered the representation, not on whether the trial judge should have been more assiduous in taking prophylactic measures [to inquire into the potential conflict]. * * * As the Sixth Amendment guarantees the defendant the assistance of counsel, the infringement of that right must depend on a deficiency of the lawyer, not of the trial judge. There is no reason to presume this guarantee unfulfilled when the purported conflict has had no effect on the representation."

"mere possibility that [the defendant's] attorney's representation of [the multiple co-defendants] might have resulted in a conflict of interests."

 To establish a constitutional caliber "actual conflict of interest" that "adversely affects counsel's performance," this Court requires a showing that the attorney " 'struggle[d] to serve two masters' " meaning that "the attorney's actions [or inactions] were motivated by divided loyalties" and "lacked a 'sound strategic basis.' " *Simpson v. State*, 769 A.2d 1257, 1267 (R.I.2001) (quoting *Cuyler*, 446 U.S. at 349, 100 S.Ct. 1708 and *Burger v. Kemp*, 483 U.S. 776, 784, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)); *see also Reynolds v. Chapman*, 253 F.3d 1337, 1343 (11th Cir. 2001) (holding that a defendant must "point to specific instances in the record * * * demonstrat[ing] that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other" and reiterating that "[i]f [the attorney] did not make such a choice, the conflict remain(s) hypothetical") (quoting *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir.1987)). In *Simpson*, this Court further clarified that even "[a]fter a finding of an 'actual' conflict, the United States Supreme Court has also required an additional showing of 'impairment' or 'harm' to the defense, although 'prejudice' need not be demonstrated." *Simpson*, 769 A.2d at 1267 (citing *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. 1708 and *Burger*, 483 U.S. at 785, 107 S.Ct. 3114).

For example, in *Reynolds*, 253 F.3d at 1347, the court concluded that the "attorney's conflict of interest had an effect upon the representation that [the defendant] received" where the public defender was put "in the untenable position of advancing arguments urging that two defendants be granted a new trial after each of those defendants had spent the entire trial attempting to foist blame on the other." *Id.* at 1345. In so deciding, the *Reynolds* court observed that the public defender "admitted that there were at least two plausible arguments that he could have advanced on [the defendant's] behalf at the motion for a new trial stage," *id.* at 1346, but that "he could not make such arguments without breaching his duty of loyalty to [the codefendant]." *Id.* at 1347.

Here, Pineda alleges that the trial justice should have realized that conflicts of interest existed between her and Jose. She further indicates that her attorney's performance was adversely affected by these actual conflicts because their shared counsel could not and did not subpoena Jose to testify for Pineda's benefit, and he did not move to sever the two cases to avoid having the jury negatively assume that Pineda shared her brother's predilection for hotheaded, drunken confrontations. Pineda also contends that her relation to Jose combined with Jose's abysmal criminal record "likely cast a shadow" over Pineda "during the sentencing phase" of her trial. In contrast to the defendant in *Reynolds*, however, Pineda can only speculate whether her attorney's duty of loyalty to Jose was the motivating factor that prevented him from calling her codefendant as a witness or severing the cases. *See Simpson*, 769 A.2d at 1267 (holding that an actual conflict of interest requires a showing that "the attorney's actions [or inactions] were motivated by divided loyalties"). In addition, the suggestion that her attorney's inability to subpoena Jose to testify to "his drunkenness" or "the pressure and coercion [Jose] placed on Pineda" that night does not persuade us that her defense was "impair[ed]." *Id.* (holding that a Sixth Amendment violation requires "an additional showing of 'impairment' or 'harm' to the defense, although 'prejudice' need not

be demonstrated"). In our view, such testimony would not have changed the landscape of the evidence against Pineda given the complainant's express testimony that Pineda was the first and most significant aggressor. *See id.* Furthermore, we cannot conclude that keeping Jose off the stand and withholding his testimony "lacked 'a sound strategic basis'" to Pineda's defense. *Id.* Finally, Pineda cannot provide this Court with more than vague assertions that a separate trial, in the absence of her recidivist-criminal brother as her codefendant, would have afforded her a more favorable defense. *Id.*; *see also Mickens*, 535 U.S. at 168–69, 122 S.Ct. 1237 (explaining that an actual conflict "is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict, such as that which 'inheres in almost every instance of multiple representation'") (quoting *Cuyler*, 446 U.S. at 348, 100 S.Ct. 1708). As such, because there is no indication in the record that her "attorney labored under an actual conflict of interest," we conclude that Pineda was not deprived of her Sixth Amendment right. *Reynolds*, 253 F.3d at 1343.

2

## Supervisory Rule

 Although holding that the Sixth Amendment does not require a trial justice to investigate for potential conflicts without "know[ing] or reasonably * * * know[ing] that a particular conflict exists,"

*Cuyler*, 446 U.S. at 347, 100 S.Ct. 1708, we acknowledge that *Cuyler* did indicate its preference for trial courts to inquire into the propriety of joint representation and advise criminal defendants of their right to "effective assistance of counsel, including separate representation" every time two or more defendants are represented by one attorney. *Id.* at 346 n. 10, 100 S.Ct. 1708 (quoting Rule 44(c) of the Federal Rules of Criminal Procedure). The *Cuyler* Court commented that adopting supervisory rules requiring such pretrial measures was "a desirable practice." *Id.*

In Rhode Island, Rule 44 of the Superior Court Rules of Criminal Procedure [13] does not touch upon the issue of joint representation. Because Pineda appeared with counsel, albeit shared counsel, our procedural rule did not require the trial justice to conduct any further investigation with regard to Pineda's choice of representation. Accordingly, Pineda invites this Court to take *Cuyler's* suggestion and adopt a supervisory rule that requires trial justices to engage in prophylactic, pretrial measures that go beyond the constitutional floor of the Sixth Amendment and our Rule 44. She argues that the trial justice should have "specifically investigated the likelihood of conflict" in Pineda's particular case and also "should have informed [Pineda and Jose] of their right to separate counsel." She implores the Rhode Island judiciary to embrace a procedural rule similar to Rule 44(c) of the Federal Rules of Criminal Procedure [14] and similarly ap-

---

**13.** Rule 44 of the Superior Court Rules of Criminal Procedure states:

"If a defendant appears in Superior Court without counsel, the court shall advise the defendant of his or her right to counsel and assign counsel to represent the defendant at every stage of the proceeding unless the defendant is able to obtain his or her own counsel or elects to proceed without counsel."

**14.** Rule 44(c)(2) of the Federal Rules of Criminal Procedure establishes a "Court's Responsibilities in Cases of Joint Representation" and states that

"[t]he court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless there is good cause to believe that no conflict of interest is likely to arise, the

plied by several state courts.[15] In these jurisdictions, trial justices have affirmative obligations to investigate for potential conflicts and to expressly inform defendants of their right to separate counsel whenever two or more defendants are represented by the same attorney. We decline Pineda's invitation to adopt a similar rule.

This Court in *Feng*, 421 A.2d at 1273, previously considered and rejected the adoption of a supervisory rule to augment Rule 44. In so ruling, we specifically noted that Feng's attorney had explained to the trial justice, on the record, that he and the defendants had discussed the possibility of conflicts prior to trial and had "concluded that there was in fact, no problem." *Id.* Because Feng had proceeded with the shared counsel after this discussion and because Feng did not present an "actual conflict" caused by the joint representation, this Court was not persuaded to adopt a rule that would require trial courts to affirmatively investigate every jointly represented criminal defendant's potential for conflicts of interest. *Id.*

█ Faced with the same entreaty from Pineda as we analyzed in *Feng*, this Court first recognizes that it uses its supervisory power "with great restraint [only] after balancing carefully the societal interests involved." *State v. Jackson*, 570 A.2d 1115, 1117 (R.I.1990). Reviewing the

societal benefits and burdens here, we again decline to disrupt the sanctity of the attorney-client relationship with a supervisory rule. We ascribe to the view that "[i]f the attorney informs the court that no conflict exists, * * * and if the client wishes to have that attorney continue to represent him, the court need not assume that the attorney is being untruthful, nor require that the client retain a different attorney. Contrary action would unnecessarily deprive the individual of his right to be represented by the attorney of his choice." Karen A. Covy, Note, *The Right to Counsel of One's Choice: Joint Representation of Criminal Defendants*, 58 Notre Dame L.Rev. 793, 801 (1983); *see also Willis v. United States*, 614 F.2d 1200, 1205 (9th Cir.1979) ("Absent objective proof we cannot assume that a lawyer representing more than one client would act in violation of the Code of Professional Responsibility, much less ignore the opportunity to introduce proof which might acquit one defendant but not the other.") (quoting *United States v. Wisniewski*, 478 F.2d 274, 285 (2d Cir.1973)). We note that in opting to share an attorney with a codefendant, a criminal defendant may have weighed other considerations including the cost of representation and the attorney's relevant experience. In our view, requiring a trial court to circumvent a defendant's independent decision-making would

---

court must take appropriate measures to protect each defendant's right to counsel."

15. We pause to appreciate that defendant's brief compiled the various jurisdictions that have adopted some form of *Cuyler's* procedural suggestion. *See, e.g., Commonwealth v. Davis*, 376 Mass. 777, 384 N.E.2d 181, 188 (1978) (noting that "although not constitutionally required," the court held that in "all criminal actions commencing after the publication date of this opinion, the trial court's obligation to ensure a fair and impartial trial will include an affirmative duty to assure that each defendant is adequately informed of the

risks and potential dangers of joint representation and that each acknowledges an understanding of this information"); *Hopps v. State Board of Parole*, 127 N.H. 133, 500 A.2d 355, 359 (1985) (holding that "[i]n the exercise of our supervisory jurisdiction, therefore, we will require in all future criminal cases involving multiple representation that both counsel and the trial court be responsible for making a record indicating that counsel has investigated the possibility of conflict of interest, has discussed the possibility with each client, and has determined that conflict is highly unlikely").

be an unnecessary use of our supervisory powers. We reiterate that criminal defendants in our jurisdiction enjoy the rights afforded to them under the Sixth Amendment, protections that this Court considers to be adequate.

 Furthermore, the alleged conflicts in Pineda's instant case also fall short of persuading this Court to adopt a supervisory rule. As occurred in *Feng,* Pineda's attorney explained to the trial justice that he had discussed the potential for conflicts with defendants prior to the proceedings and did not anticipate any issues arising. *See Feng,* 421 A.2d at 1273. Neither Pineda, nor Jose, questioned their attorney's statement, which was made on the record and in their presence. Then, during the colloquy between Pineda, Jose, and the trial justice, both defendants had an opportunity to assert that he or she did not wish to accept the potential for conflicts of interest and preferred some other arrangement. Because Pineda did not so object or inquire into the propriety of their joint counsel at that time, it is our opinion that Pineda knowingly and voluntarily waived any conflicts when she signed the stipulation, and the trial justice was permitted to continue trial without further inquiry. Again, although Pineda presents alleged conflicts that may have affected the outcome of her trial or sentencing, "the mere possibility that [her] attorney's representation of [Pineda] and [Jose] might have resulted in a conflict of interests" does not persuade us to adopt a supervisory rule upon her conjecture. *Id.* at 1272.

both challenge the legal sufficiency of the evidence. However, prevailing on an acquittal motion is a heavier burden for a defendant because the trial justice "must view the evidence in the light most favorable to the state, \* \* \* giving full credibility to the state's witnesses, and draw[ing] therefrom all reasonable inferences consistent with guilt." *State v. Cardin,* 987 A.2d 248, 250 (R.I.2010) (quoting *State v. Caba,* 887 A.2d 370, 372 (R.I.2005)). Conversely, the new-trial motion does not favor the state's evidence, and instead permits the trial justice to "use[ ] independent judgment to weigh the evidence and assess the credibility of the witnesses." *State v. Dame,* 560 A.2d 330, 334 (R.I.1989). When faced with a defendant's challenge to the rulings on both motions, as here, this Court first conducts a review of the new-trial motion. *See State v. Cardona,* 969 A.2d 667, 672 (R.I.2009) ("Because both of [the] defendant's motions [motion for judgment of acquittal and motion for a new trial] raised the same challenge to the sufficiency of the evidence, we shall conduct the more exacting analysis required for review of a ruling on a motion for a new trial."). Essentially, unless a defendant can show that the presented evidence failed to support his or her conviction upon the motion-for-a-new-trial standard, a defendant necessarily will be unable to establish he or she was entitled to a judgment of acquittal. *See State v. Hesford,* 900 A.2d 1194, 1200 (R.I.2006). Accordingly, we begin our review with the trial justice's denial of Pineda's motion for a new trial.

## C

### Sufficiency of the Evidence

 A motion for a judgment of acquittal [16] and a motion for a new trial

## 1

### Motion for a New Trial

 "When deciding whether to grant or deny a motion for a new trial, 'the

---

**16.** Rule 29(a) of the Superior Court Rules of Criminal Procedure permits that a motion for a judgment of acquittal may be made at the close of the prosecution's case and also at the

close of all evidence. Pineda abided by these procedural rules and made a motion at each evidentiary juncture.

trial justice acts as a thirteenth juror.'" *State v. Espinal*, 943 A.2d 1052, 1058 (R.I. 2008) (quoting *State v. Imbruglia*, 913 A.2d 1022, 1028 (R.I.2007)). "[T]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *Id.* (quoting *State v. Morales*, 895 A.2d 114, 121 (R.I.2006)). The new-trial motion should be denied "[i]f the trial justice concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did * * *." *Id.* (quoting *State v. Day*, 925 A.2d 962, 984 (R.I.2007)). However, after conducting an independent review, if the trial justice finds that the state failed to establish the defendant's guilt beyond a reasonable doubt, then the trial justice must afford a new trial to the defendant. *State v. Bergevine*, 942 A.2d 974, 981 (R.I.2008). On appeal, this Court "accord[s] great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." *Espinal*, 943 A.2d at 1058. We will overturn the trial justice's decision only if we are convinced "that the trial justice committed clear error or that he or she 'overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case.'" *Id.* (quoting *State v. Bolduc*, 822 A.2d 184, 187 (R.I.2003)).

Here, Pineda argues that the evidence presented did not support a finding beyond a reasonable doubt that she assaulted Rodrigues with a dangerous weapon, a hammer. Pineda contends that none of the witnesses, aside from Rodrigues, testified to Pineda using a hammer to hit Rodrigues. Rather, Pineda maintains that the witnesses only recalled a "fistfight" or "pulling hair." Furthermore, Pineda maintains that Rodrigues was not credible and it was clear error for the trial justice to focus so heavily on Rodrigues's testimony without fully crediting the allegedly contradicting testimony of Det. Gonsalves and Officer Cardente. She implores this Court to hold that the trial court erred by denying her motion for a new trial.

We acknowledge that the trial justice recognized that this case "principally revolved around the credibility of various witnesses" and that the primary players were Rodrigues and Pineda, both of whom testified. He continued that he could not "fault" the jury for "opt[ing] to believe * * * Rodrigues['s] version of the events," even though there were discrepancies in her recollection at trial and to the police. The trial justice explained "those inconsistencies were well highlighted by defense counsel," but it was satisfactory to him that "the jury obviously accepted the essence of [Rodrigues's] testimony." He further noted that by taking the stand, Pineda took a calculated risk that ultimately backfired. The trial justice quoted that "[a] trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn." *State v. Mattatall*, 603 A.2d 1098, 1109 (R.I.1992) (quoting *United States v. Cisneros*, 448 F.2d 298, 305 (9th Cir.1971)). Beyond noting that Rodrigues prevailed in the credibility contest between the two principal witnesses, the trial justice recited other evidence that supported the jury's verdict including: the hammer found in Pineda's car, the threat from Jose to Rodrigues promising retaliation from Pineda, and Pineda's avoidance of the police that night. Effectively, the trial justice relied on nu-

merous reasons for crediting the jury's verdict, not just Rodrigues's testimony.

Our review of the record elicits even more evidence in favor of that verdict, including Officer Kane's testimony that while he was at the hospital, Rodrigues told him she was hit with a hammer. We also note that after reviewing photographs of Rodrigues taken at the police station that night, Det. Gonsalves testified that Rodrigues did look as if she had been hit in the eye, probably with a hammer. Accordingly, given the deference afforded to the trial justice's ruling and Pineda's overstatement of the weight that the trial justice actually afforded to Rodrigues's testimony, we decline Pineda's invitation to offer her a new trial. We likewise hold that the trial justice provided "sufficient reasoning in support of the ruling." *Espinal*, 943 A.2d at 1058.

### 2

### Motion for a Judgment of Acquittal

 We review a trial justice's denial of a motion for a judgment of acquittal using the same prosecution-deferential standard as the trial court applies. *See Cardin*, 987 A.2d at 250. When "viewed in this light, [if the evidence] is sufficient to support a verdict of guilty beyond a reasonable doubt, the motion must be denied." *State v. Grant*, 946 A.2d 818, 826 (R.I.2008) (quoting *State v. Mondesir*, 891 A.2d 856, 861 (R.I.2006)). However, "a judgment of acquittal shall be entered when the evidence is not legally sufficient to sustain a conviction." *Cardin*, 987 A.2d at 250 (quoting *State v. Ros*, 973 A.2d 1148, 1159 (R.I.2009)). "[H]aving concluded that the evidence 'was sufficient to withstand the more stringent review applicable to a motion for a new trial, it follows that the evidence was also sufficient to withstand a motion for a judgment of acquittal.'" *Hesford*, 900 A.2d at 1200 (quoting *State v.*

*Otero*, 788 A.2d 469, 475 (R.I.2002)). Accordingly, we also decline to disturb the trial justice's denial of Pineda's motions for a judgment of acquittal.

### III

### Conclusion

We affirm the Superior Court judgment in all respects and direct that the record be transferred to the Superior Court.