STATE

v.

**Memeh KIZEKAI.**

No. 2009–211–C.A.

Supreme Court of Rhode Island.

May 19, 2011.

Lauren S. Zurier, Department of Attorney General, for state.

Marie T. Roebuck, Office of the Public Defender, for defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

The defendant, Memeh Kizekai (defendant or Kizekai), appeals from a judgment of conviction in Superior Court. He contends that the trial justice erred by denying his motion for a new trial because, as Kizekai maintains, the testimony of a state witness was not credible, and the state failed to present sufficient evidence to support his conviction. The defendant's appeal came before this Court, sitting for oral argument at Classical High School, on April 5, 2011, pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be decided summarily. After our careful inspection of the Superior Court record and the written and oral submissions of the parties, we conclude that this appeal may be decided at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On July 6, 2007, criminal information P2/07–2405A charged Kizekai with count 1, uttering and publishing,[1] in violation of G.L.1956 § 11–17–1, and count 2, conspiracy to commit said crime, in violation of G.L.1956 § 11–1–6. A trial was held on July 24, 25, and 28, 2008, before a jury empanelled by the Providence County Superior Court. The state presented seven witnesses,[2] including Sonnah Sampson (Sampson), whose credibility Kizekai now

---

1. Although they are included within the same statutory section entitled "[f]orgery and counterfeiting in general," the crime of uttering and publishing is distinct from the crimes of forgery and counterfeiting. General Laws 1956 § 11–17–1 states in relevant part:

   "Every person who shall falsely make, alter, forge, or counterfeit or procure to be falsely made, altered, forged, or counterfeited * * * with intent to defraud, *or* who shall *utter and publish* as true or shall procure to be uttered and published as true any such false, forged, altered, or counterfeited record, deed, or other writing as provided in this section, knowing it to be false, forged,

   altered, or counterfeited, with intent to defraud, shall be punished by imprisonment for not more than ten (10) years, or by a fine of not more than one thousand dollars ($1,000), or both." (Emphases added.)

2. The state's other witnesses included the police detective who investigated the crime, Det. David Connors; the owner of the stolen check, David Lahousse; the credit union teller who received the deposited check, Michelle McWilliams; the credit union teller who fulfilled the withdrawal request, Elizabeth Dean; and the security officer at the credit union, John T. Clarkson.

contests on appeal. Kizekai was the sole witness called in his defense.

## A

### Undisputed Facts

Both Sampson and Kizekai testified that they knew each other from occasional encounters in social settings.[3] They also agreed that on December 19, 2006, Kizekai drove his car, with Sampson in the passenger seat, to the drive-through teller's window of the Pawtucket Credit Union's (PCU or bank) Broadway branch in Pawtucket. While at the window, Kizekai placed the transaction canister containing a check for $7,500[4] into the PCU's pneumatic tube system, which delivered the canister and its contents to the teller inside the bank. The check was made payable to "Sonnoh Sampson"[5] with the word "supplies" written on the memo line. The check, which later was reported stolen, was drawn on a personal account at Dean Bank in Massachusetts; and the funds were deposited into Sampson's PCU account. On December 21, 2006, Sampson returned to the PCU to withdraw $4,700 in cash from her bank account. Ultimately, both Sampson and Kizekai were charged under the same criminal information with uttering and publishing and conspiracy, both felonies. However, Sampson, in exchange for her testimony against Kizekai and payment of $4,700 in restitution, was permitted to plead nolo contendere to a single, reduced charge of obtaining money under false pretenses. At oral argument, the state clarified that Sampson's plea to this misdemeanor was filed, pursuant to G.L.1956 § 12–10–12, and subject to expungment if Sampson avoided further criminal infractions for one year.

The parties agree that this appeal challenges the outcome of the credibility contest between Sampson and Kizekai. As such, this Court will limit further recitation of the facts to a delineation of their respective trial testimonies.

## B

### Conflicting Trial Testimonies

#### 1

#### Sampson

According to Sampson, about a week prior to the PCU deposit, Kizekai asked her if she would assist him in cashing a personal check that he had received for a construction job. Allegedly, Kizekai was in a bind because he did not have a checking account in which he could cash the check; and, because the check was from a personal account, he could not cash the check at a check-cashing business either. Sampson testified that she agreed to help Kizekai; and, on December 19, 2006, she drove her mother's car to meet him in the parking lot of the PCU's Broadway branch. Sampson recalled that she exited her vehicle, sat in the passenger's seat of

---

**3.** This Court notes that Kizekai and Sampson somewhat disagree as to the extent of their relationship. Kizekai testified that the pair spent enough time together to classify their status as "casual friends," whereas Sampson represented to the jury that their contacts were more sparse, akin to those of "casual associates."

**4.** We note that Sampson testified that she believed that she provided her driver's license to make the deposit while Kizekai testified

that Sampson completed a deposit slip, but he did not mention that she produced her driver's license. During its direct examination, the state elicited testimony from Sampson that her license number was handwritten on the back of the check.

**5.** This Court notes that according to the trial transcript, Sampson spells her first name "Sonna h," but that the check was made out to "Sonno h Sampson."

Kizekai's car, and then the pair drove to the PCU's drive-through teller's window. She testified that when Kizekai handed her the check, it already was made out in her name and endorsed with her signature on the back. According to Sampson, she supplied her driver's license, and then the two items were given to the teller. The teller completed the deposit and presented Sampson with a receipt indicating that the funds would not post to her account immediately. Sampson recalled that she gave this form to Kizekai and also told him her account password so he could check the balance by phone.

Sampson testified that approximately two days after the PCU transaction, Kizekai called to tell her that the deposit had posted in part and that some funds were ready for withdrawal. Sampson recalled that in response to Kizekai's request, on December 21, 2006, she withdrew $4,700 in cash from her PCU account, met Kizekai at her home, and gave him the entire amount. She explained that she did not return to the PCU to withdraw the remaining $2,800 because, within a week, PCU informed her that she had deposited a "bad check" and would have to repay the amount she had withdrawn. When Sampson allegedly called Kizekai to question him about the check, he told her that there must have been a mistake because the check was legitimate. Sampson testified that soon after this exchange with Kizekai, she learned that the Pawtucket police wanted to speak with her. She immediately met with the police and provided them with her statement of the events. Sampson testified that she attempted to contact Kizekai on at least two other occasions, but his phone numbers were disconnected. Sampson also avowed that when she saw Kizekai at a pretrial proceeding related to this matter, he told her that she "should have kept [her] mouth shut and just took the charge," but that "he was going to beat the case anyway."

On cross-examination Sampson admitted that her PCU account contained only $9.18 prior to the $7,500 deposit in December 2006. And, although there were various withdrawals from the account (some of which Sampson disputed) after the December 2006 deposit, Sampson acknowledged that her account statement did not reflect any additional credits. However, Sampson denied that she and defendant agreed to deposit a "bad check," and she denied receiving any money from the check.

### 2

### Kizekai

Like Sampson, Kizekai also testified that a friendly favor led the pair to the PCU teller's window on December 19, 2006. However, contrary to Sampson's recollection, Kizekai alleged that it was he who was doing the favor for Sampson. According to Kizekai, Sampson was visiting him at his apartment and asked if he would drive her to a hair appointment because her car was being repaired as the result of an accident. Kizekai recalled that he indulged her request and, while enroute, Sampson asked Kizekai if he also would take her to the PCU, near her final destination, so she could deposit a check before her appointment. Again, Kizekai obliged. He testified that he saw the amount of the check and questioned Sampson as to how she came into such funds. Her alleged reply was that the check was payment for her car repairs. At trial, Kizekai denied giving Sampson a stolen check or receiving any proceeds from the deposit. He also maintained that, during the time in question, he had a full-time job paying between $1,500 and $2,000 biweekly and that he

held a checking account and a savings account [6] at Bank of America.

## C

### Motion for New Trial and Sentencing

On July 28, 2008, the jury found defendant guilty of count 1.[7] Kizekai subsequently filed a motion for a new trial based on Rule 33 of the Superior Court Rules of Criminal Procedure that was argued before the trial justice on September 19, 2008. Kizekai first propounded that the entirety of the state's case against him turned on Sampson's testimony, which he alleged was incredible. He maintained that on a "major issue," the jury improperly credited Sampson's testimony about the car switch in the PCU parking lot instead of accepting Kizekai's more believable testimony that he drove Sampson to the PCU as a favor to her. Kizekai's counsel mused to the court, "[w]hy would [he] devise this elaborate scheme to cash a stolen check by using Ms. Sampson and then drive his own car through the drive-[through] * * *? Why wouldn't he convince [Sampson] to use her car [which was, according to her, parked in the PCU lot] if he convinced her to do all of the other things that he [allegedly] convinced her to do in terms of cashing the check?" He also doubted the jury's fact-finding ability because the jurors seemingly did not appreciate the lack of evidence, beyond Sampson's testimony, that Kizekai "ever received any of the money from this check." Finally, Kizekai disputed Sampson's accusation that he "threaten[ed] her in the courthouse" by arguing that "[i]t doesn't make sense and it's not credible" considering the pair see each other "around," outside of the earshot of "sheriffs, marshals, [and] police officers," interactions that Kizekai apparently considered to be more appropriate times for intimidation. The defendant concluded that "Sampson shouldn't be given more credibility simply because she cooperated with law enforcement authorities [by agreeing to testify against him]" and that overall, "the jury misconstrued the testimony of Ms. Sampson."

In its objection to the new-trial motion, the state concurred that "[t]he sum and substance of the case does turn largely on the credibility of Ms. Sampson," but it contended that Sampson was "a most credible and candid witness." The state explained that Sampson "without hesitation, responded to the police department['s investigation] and provided a detailed statement as to her involvement in the negotiation of that check." Then, countering Kizekai's musings as to why he would drive his own car through the drive-through to pass a knowingly bad check, the state asked the reciprocal question of why Sampson, "if she[, instead of Kizekai,] was the perpetrator of this offense, * * * would * * * contact an individual to simply witness her commit a crime." The state also questioned "why in the world" Sampson would "knowingly deposit a stolen check in her own account knowing that of course the check would be traced back to her." As for defendant, the state maintained that he "was not credible" given the "evasive[ness] in his answers" and his "illogical" testimony.

After hearing the parties' arguments, the trial justice rendered a bench decision denying defendant's motion for a new trial. He acknowledged his role "as a 13th or super juror" articulating that his determi-

---

6. Cognizant that the state bears the burden of proof in criminal trials, we nonetheless note that Kizekai did not present bank records to corroborate his testimony.

7. After resting its case, the state dismissed count 2 based on Rule 48(a) of the Superior Court Rules of Criminal Procedure.

nation is "whether or not the evidence placed before the [c]ourt was sufficient to substantiate and sustain the verdict that the jury achieved." Even in the event that he "disagreed with the jury's result," the trial justice explained, if the verdict was "a probable and reasonable result after a review of the evidence, * * * [he] must affirm." Then, based on Kizekai's criticisms, the trial justice again summarized that "[t]his is simply a case of credibility."

He recalled that Sampson "went into great detail as to" the preliminaries of meeting Kizekai in the parking lot of the bank and the events that transpired before the check was passed. The trial justice stated that he considered Sampson "far more credible than Mr. Kizekai" and assessed that "[s]he was duped [by him] more likely than not." He reasoned that Sampson was more believable because Kizekai's version of the events required the trial justice to accept that Sampson was "stupid." He refused to suppose, in accordance with Kizekai's testimony, that Sampson was so foolish that she brought Kizekai to the PCU to witness her crime and knowingly deposit a bad check into her own account that "undoubtedly" would be traceable to her. In his further evaluation of Kizekai as a witness, the trial justice explained that Kizekai "didn't seem to be forthright in his answers" and "[h]e was evasive in some and sometimes he was a little bit aggressive." Noting that an aggressive demeanor would have been "fine if he was telling the truth," the trial justice also stated that he "didn't believe [Kizekai's] version of the events." Going a step further than was required because the trial justice "did believe Ms. Sampson's [version

of the events]," the trial justice also concluded that "even if the [c]ourt felt that Mr. Kizekai was more credible," he did not believe he "could disturb the verdict anyway." Accordingly, "see[ing] no reason to overturn the jury," the trial justice denied the motion for a new trial.

Sentencing occurred on November 21, 2008. The trial justice imposed a two-year suspended sentence, with three years probation.[8] Kizekai filed a notice of appeal on December 8, 2008.[9] The judgment of conviction was entered on December 15, 2008.

## II

### Issues on Appeal

On appeal, defendant's primary objection to the trial justice's denial of his motion for a new trial is rooted in Kizekai's subjective disbelief of Sampson's testimony. He argues that "the record is void of any reason why one witness should be believed over the other" and highlights Sampson's plea bargain as her motivation for giving incriminating testimony against him. Kizekai also contrasts Sampson's nearly empty bank account with his biweekly paychecks to allude to Sampson's possible motive for passing a bad check and why her testimony implicating defendant should have been disbelieved by the jurors and the trial justice. In his second objection to the new-trial denial, Kizekai contends that the state lacked evidence to prove its case against him. "Most telling," Kizekai asserts, "[was] the state's failure to present" a handwriting expert to testify that the handwriting on the check was his.

---

8. At the time of sentencing, restitution was left "to be determined;" however on April 2, 2009, after the complaining witness did not respond to an investigation request, the required restitution was deemed zero dollars, and the case was closed.

9. "Although [Kizekai's] notice of appeal was premature, it is nevertheless valid as final judgment was ultimately entered." *Poulin v. Custom Craft, Inc.*, 996 A.2d 654, 658 n. 4 (R.I.2010).

For its part, the state argues that Kizekai does not "present any meaningful argument" to dispute the highly deferential credibility findings of the trial justice, nor does Kizekai explain inconsistencies in his own trial testimony. For example, the state notes that the memo line of the check that reads "supplies" is a fact that corroborates Sampson's testimony that the check allegedly was for Kizekai's construction job and detracts from Kizekai's testimony that the check was for Sampson's car repairs. The state also highlights that Kizekai never disputed Sampson's testimony that he "lambasted her for going to the police" and that Kizekai previously fought with a person whose last name coincidentally matches the last name of two other payees of forged checks from the same checkbook as the instant check.[10] Concerning Kizekai's argument that the state failed to present an expert to establish that his handwriting was on the check, the state counters that the handwriting on the instrument is immaterial to a crime of uttering and publishing. The uttering and publishing crime, the state explained, "is committed when the fraudulent check is presented to the bank, not when the check is written out." Accordingly, the state requests that we affirm the trial justice's denial of the new-trial motion in all respects.

## III

### Standard of Review

■■■ On appeal, this Court "accord[s] great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." *State v. Guerra*, 12 A.3d

759, 766 (R.I.2011) (quoting *State v. Texieira*, 944 A.2d 132, 140–41 (R.I.2008)). "In providing a rationale for a decision, * * * the trial justice need not refer to all the evidence supporting the decision," rather he "need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." *Id.* (quoting *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994)). "We will overturn the trial justice's ruling only if we are convinced 'that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case.'" *State v. Cardona*, 969 A.2d 667, 672–73 (R.I.2009) (quoting *State v. Espinal*, 943 A.2d 1052, 1058 (R.I. 2008)). Especially pertinent to the instant case, we note that "[t]his Court 'employ[s] this deferential standard of review [with respect to a motion for a new trial] * * * because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and *to judge the credibility of the witnesses.*'" *Guerra*, 12 A.3d at 766 (quoting *Texieira*, 944 A.2d at 141) (emphasis added).

## IV

### Discussion

■■■ As the trial justice aptly described, "[w]hen deciding whether to grant or deny a motion for a new trial, '[he] acts as a thirteenth juror,'" *State v. Pineda*, 13 A.3d 623, 640–41 (R.I.2011) (quoting *Espinal*, 943 A.2d at 1058) or "superjuror," *State v. Kittell*, 847 A.2d 845, 851 (R.I. 2004) (quoting *State v. Zmayefski*, 836 A.2d 191, 196 (R.I.2003)). In so doing, "the trial justice must (1) consider the

10. Although not discussed by the trial justice in his ruling on the new-trial motion, we observe that, on redirect, Kizekai acknowledged that he had physically fought with a person named Whea *Makor* in April 2006.

However, he stated that he did not know Nutuapele or Nang *Makor*, payees of other checks stolen from the same checkbook as the instant check.

evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *Pineda,* 13 A.3d at 641 (quoting *Espinal,* 943 A.2d at 1058). "If the trial justice concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did * * *," the motion for a new trial should be denied. *Id.* However, after conducting an independent review, if the trial justice finds that "the verdict is against the fair preponderance of the evidence and fails to do substantial justice" then the trial justice must afford a new trial to the defendant. *Guerra,* 12 A.3d at 765–66 (quoting *State v. Rivera,* 839 A.2d 497, 503 (R.I.2003)); *see also State v. Bergevine,* 942 A.2d 974, 981 (R.I.2008).

In accordance with our caselaw, we observe that the trial justice conducted a proper review of the trial proceedings and then stated his reasons for denying Kizekai's motion for a new trial. *See Guerra,* 12 A.3d at 766. He explained that he simply did not believe Kizekai's testimony and that the jury was perfectly within its domain as the fact-finder to credit Sampson's version of the events instead of Kizekai's. The trial justice specifically recalled that he was not moved to believe Kizekai because "he didn't seem to be forthright in his answers" and "[h]e was evasive in some and sometimes he was a little bit aggressive." This Court expressly has heralded that "[a] trier of fact is not compelled to accept and believe the self[-]serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn." *State v. Mattatall,* 603 A.2d 1098, 1109 (R.I.1992) (quoting *United States v.*

*Cisneros,* 448 F.2d 298, 305 (9th Cir.1971)). On appeal, Kizekai does not present this Court with any cognizable argument to refute the trial justice's assessment of his candor or disbelief of his testimony. Furthermore, given our deferential review of a trial court's credibility determinations and the instant trial justice's salient reasoning, we do not quarrel with his assessment of Kizekai. *See State v. Roberts,* 705 A.2d 1380, 1380 (R.I.1997) (mem.) ("When the trial justice is faced with a credibility determination, this [C]ourt will give great deference to his or her determination and will not itself weigh the credibility of the witnesses.").

In addition to the trial justice's disenchantment with Kizekai's courtroom presentation, he also found Sampson more believable because he could not reasonably accept the substance of Kizekai's testimony. The trial justice was not moved to suppose that Sampson was so "stupid" that she would bring a witness to watch her utter and publish or that she would choose to deposit a knowingly bad check into her own account. On appeal, Kizekai attacks the trial justice's endorsement of Sampson's credibility, contending that he overlooked the possibility that Sampson fabricated her testimony to win herself a less severe criminal outcome. Kizekai also argues that Sampson was not an unassailable witness. In particular, Kizekai raises the issue of Sampson's virtually empty PCU account to allude to Sampson's potential motive for being the principal architect of this scam. We note, however, that defense counsel stridently cross-examined Sampson on this fact, and it was within the province of the jury and the trial justice as superjuror to evaluate the impact of her PCU balance on her credibility. Evidently, both chose to believe the essence of her testimony implicating Kizekai rather than venturing down the breadcrumb trail of

possible modus operandi left by him. We ascertain no clear error in their view. *See State v. Nania*, 786 A.2d 1066, 1068 (R.I. 2001) ("[I]nconsistencies are factors that are part of the credibility determination, but are not conclusive" and "do not necessarily negate the value of a witness'[s] testimony.").

■ As to defendant's bald assertion that the state weakened its case by not calling a handwriting expert as a witness to prove that Kizekai's, and not Sampson's, handwriting appeared on the check, this Court's opinion remains unaffected. Here, the state proved beyond a reasonable doubt that Kizekai committed an "uttering and publishing," not a forgery. Although the crime of forgery requires proof that the individual created the false writing and therefore, may lend itself to handwriting-expert testimony, the crime of uttering and publishing requires only that the offeror of the negotiable instrument knows that the writing was false. *See* § 11–17–1; *State v. Oliveira*, 730 A.2d 20, 25–26 (R.I. 1999). Essentially, "[t]he forger need not be the utterer and the utterer need not be the forger nor are either even required to be aware of the other." *Oliveira*, 730 A.2d at 26. Based on the verdict rendered and the denial of the motion for a new trial, the jury and the trial justice obviously believed

Sampson's testimony that Kizekai knew the check was a forgery when he requested her assistance in depositing it. We hold that the state did not have to take an additional step of showing that Kizekai also wrote the forged check in order for the jury to find him guilty of uttering and publishing. *Id.*[11]

Accordingly, based on the record before us and the deferential standards with which we review a trial justice's denial of a motion for a new trial and his assessment of witness credibility, we conclude that the trial justice did not shirk his superjuror duties. We locate no clear error or misconception of material evidence in his decision. *See Cardona*, 969 A.2d at 672–73.

## V

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The materials associated with this case may be remanded to that court.

---

11. Furthermore, this Court notes that Kizekai did not raise the handwriting issue during trial or at the hearing on the motion for a new trial. *See In re Miguel A.*, 990 A.2d 1216, 1223 (R.I.2010) ("This Court's 'raise-or-waive' rule precludes our consideration of an issue that was not raised or articulated at trial."). We also observe that on December 17, 2007, well before the July 2008 trial, the trial court granted Kizekai's request to obtain a handwriting expert at the expense of the state. Although we appreciate that the burden is on the prosecution to prove each element of the crime of uttering and publishing, if Kizekai somehow wanted to raise doubt as to his guilt on that criminal offense by offering the testimony of a handwriting expert, he was well within his means to do so. He cannot now complain that the state failed to take this abjectly superfluous step in proving its case of uttering and publishing as a way to justify his demand for a new trial.