**Supreme Court**

No. 2014-133-C.A.
(P1/11-3317A)

State      :

v.       :

Christopher Swiridowsky  :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| State | : |
| v. | : |
| Christopher Swiridowsky | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.** On July 19, 2013, a Providence County Superior Court jury found the defendant, Christopher Swiridowsky (defendant or Swiridowsky), guilty of three counts of first degree sexual assault in violation of G.L. 1956 §§ 11-37-2 and 11-37-3, guilty of one count of assault with the intent to commit a sexual assault in violation of G.L. 1956 § 11-5-1, and not guilty of one count of kidnapping under G.L. 1956 § 11-26-1. On October 15, 2013, the trial justice sentenced the defendant. With respect to the first three counts, the defendant was sentenced to forty years imprisonment for each, with twenty-five years to serve and the remaining time suspended, with probation, to run concurrently. On count four, the defendant was sentenced to ten years imprisonment, with two years to serve and the remaining time suspended with probation, to run consecutively to the first three counts.

On appeal, the defendant contends that the trial justice erred in: (1) permitting the state to impeach him with a prior conviction for assault; and (2) denying his motion for a new trial. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

- 1 -

# I

## Facts and Travel

The incident giving rise to defendant's conviction occurred in the early morning of October 28, 2007, in Providence, Rhode Island. After the alleged sexual assaults occurring on that date, swabs were taken from the mouth and vagina of the complaining witness, Sarah.[1] Over three years later, on January 13, 2011, the DNA sample that had been taken from Sarah's mouth was matched to defendant through a nationwide database of DNA profiles known as CODIS (Combined DNA Index System).

On December 1, 2011, defendant was charged by indictment with the above-referenced offenses. The defendant's trial began on July 16, 2013. The state presented six witnesses,[2] including Sarah, whose credibility defendant now contests on appeal. The defense presented five witnesses,[3] including defendant himself. During trial, it was undisputed that the paths of Sarah and defendant crossed on October 28, 2007. However, the testimony diverges as to exactly what happened prior to and during the encounter between them. The relevant portions of such testimony are summarized below.

---

[1] We use a pseudonym to protect the privacy of the complaining witness.

[2] The state's other witnesses included the officer who responded to the call from Sarah's roommates on the night of the incident, Officer Paul Principale; the registered nurse who attended to Sarah and administered the sexual assault evidence collection kit, Amy Corrado; Sarah's roommate when the incident at issue occurred, Holly Marshall; the supervisor of the forensic biology DNA laboratory at the Department of Health who examined the swabs taken from Sarah, Cara Lupino; and the detective who worked on identifying the perpetrator of the sexual assault, Det. Douglas Allin.

[3] The defense's other witnesses were all character witnesses: Michael Guzman, Belinda Myers, Pastor Jose Rivera, and Cherie Castro.

**A**

**Conflicting Trial Testimonies**

**1. Sarah's Testimony**

In October of 2007, Sarah was employed as a "salad and pizza cook" at Nordstrom's Café at the Providence Place Mall. On October 27, 2007, she worked until 9 p.m., at which time she changed out of her work uniform and walked to the City Café, a place that she frequented three or four times per week. There, Sarah consumed about four vodka and cranberry juice drinks. At some point during her stay at the City Café, her friend, Matt, arrived and sat next to her until between one and two in the morning. Sarah then left the City Café and walked with Matt to his apartment.

The two remained at Matt's apartment until "sometime before five o'clock in the morning," when Sarah left because "[i]t was getting late, and the night was over." Sarah testified that, although Matt offered her a ride home, she declined and decided to walk home because "[they] both had been drinking." Before leaving, Sarah indicated to Matt that she would send him a text message when she arrived at her apartment to let him know that she had arrived safely. However, she testified that she actually sent him a text message letting him know that she was home and safe "about two and a half blocks, maybe three blocks from [her] house." She explained that it was not uncommon for her to send such a message when she got close to home, rather than waiting until she arrived.

At trial, Sarah explained that, shortly after she sent the text message, a "dark-colored SUV" pulled up next to her, driven by a man with a shaved head who was wearing a white T-shirt. The driver asked if she wanted a ride, to which she replied, "No. I'm all set. Thanks." She then continued to walk and the car came up next to her again, but this time the driver asked

if she "wanted to get high." She testified that again she replied, "No. I'm all set. Thanks." She explained at trial that the SUV then turned and she continued to walk, but "a few second[s] later, [she] heard someone yell, 'Yo, yo,' behind [her]." She further recounted that, when she went to turn, she was grabbed by the hair on the back of her head and was told: "Now you don't have a choice." She testified that she attempted to take her cell phone out of her pocket to call for help, but the man noticed what she was trying to do and grabbed her wrist. Sarah then testified that, after she promised that she would not try to call anybody, the man let her maintain possession of the phone. She recounted during trial that the man dragged her toward the dark-colored SUV, during which time she was attempting to get away and make it "as difficult as possible" for the man to drag her by "trying to move [her] hands * * * [and] tr[ying] to drop [her] weight to the ground." She explained that, in response to her challenging gestures, the man struck her in the side of the head, after which she got into the vehicle.

Sarah then testified that, when she was placed in the SUV, the man walked around the car and got into the driver's side. She further testified that she did not attempt to get out of the car, stating, "[a]t that point I was frozen, and the door – I heard the locks go, and I was just too scared to move." Thereafter, according to Sarah's testimony, the man drove "about a block and a half, two blocks [and w]hen the car finally stopped, [she] could see her apartment." She next testified that, when the vehicle stopped, the man said, "[j]ust do what I tell you to do, and I'll let you go home." She explained that the man then told her that he wanted her to perform oral sex on him, but she repeatedly refused, causing the man to "pull[] out a gun, * * * put it in [her] mouth, and [tell her] to hand over [her] bag." She recounted that she then handed her bag to him; and, after he removed her identification from her wallet, he stated that he had her address and, if she did not cooperate, "he would come and shoot [her] and whoever lived with [her]." Sarah testified

- 4 -

that he then forced her to perform oral sex on him. In her testimony, she stated that the man later pointed the gun at her again and told her that he wanted her to take her clothes off. She testified that she complied with his request. Sarah further testified that he then told her to get on top of him in the driver's seat at which point he forced her to engage in vaginal intercourse. At trial, Sarah stated that the man then told her to perform oral sex on him again, which she did. She testified that the man then pushed her off and stated, "I'm not giving you evidence, bitch." She further testified that the man then pushed her out of the passenger door, told her to lie on the sidewalk with her face down, and threw her belongings at her.

At trial, Sarah testified that once the SUV drove away, she ran screaming toward her house, "slam[med] on the door, and it woke up [her] roommates." She recounted that when her roommates opened the door, she collapsed, and one of her roommates called the police. After the police arrived, Sarah was transported by ambulance to Women and Infants Hospital. Sarah testified that while at the hospital she gave a statement to police and a sexual assault evidence collection kit was administered, which included a swab of Sarah's mouth and vagina. Sarah then testified that she was asked by the police to look at photos to identify the perpetrator, but she was unable to conclusively identify the person who committed the offenses.

On cross-examination, Sarah confirmed her earlier testimony from direct examination that the man did not pull the gun out while they were on the street. When questioned about statements that she made immediately following the accident, Sarah indicated that she did not remember telling the nurse, EMT driver, or the responding police officer that she was forced into the vehicle at gunpoint, as opposed to having the gun pulled out after she entered the vehicle.

## 2. Swiridowsky's Testimony

At the close of the state's case, defendant moved for judgment of acquittal, which the court denied. The defense then presented its case, calling defendant as its first witness. The defendant testified to a markedly different account of events occurring on October 27 and 28, 2007. He testified that he was at a Halloween party until approximately midnight, at which time he left and went to another party until about 4:30 a.m. There, defendant and a friend were using cocaine, smoking marijuana, and drinking alcohol. The defendant testified that, after leaving the second party, he was driving back to his house and his friend was following behind him in another vehicle. The defendant stated at trial that he came upon Sarah, who was walking down the street, and asked her if she needed a ride, which she declined. He explained that his friend then called him on his cell phone, stating, "Why don't you pick up that girl? She's out there at five o'clock in the morning. She's obviously up to something." The defendant next testified that he circled his car around and asked Sarah if she "want[ed] to get high?" According to defendant's testimony, this sparked an exchange in which Sarah told him she was already on her way to meet a friend for cocaine and directed him to pull into a nearby driveway to wait for her to return.

At trial, defendant next stated that he "got antsy sitting in the truck," so he got out of the vehicle and walked to Admiral Street, where he saw Sarah walking back toward him. According to defendant's testimony, Sarah had been unable to obtain any drugs, so the two went back to defendant's vehicle to use the cocaine that he had in his possession. The defendant testified that the two then ingested cocaine in the car at the location where it had been parked. He then asked Sarah if she wanted a ride home, which she answered in the affirmative. The defendant further

testified that she gave him directions to her house and, when Sarah's house was in sight, she directed him to stop the vehicle because she did not want her roommates to see them.

The defendant testified that she then asked for more cocaine before getting out of the truck. According to his testimony, he initially declined, but then offered her cocaine in exchange for what he "implied" was oral sex. He testified that the two then engaged in vaginal intercourse after he suggested that he would give her more cocaine if she agreed. He further testified that to avoid getting her pregnant, the encounter transitioned back to oral sex. According to his testimony, he agreed to alert her before ejaculating, because she did not want him to ejaculate in her mouth. He testified that he did not so alert her and he ejaculated in her mouth, causing her to become very upset. He explained that she angered him by screaming while they were in a "quiet residential neighborhood," so he refused to give her more cocaine and told her to get out of his vehicle. At trial, he stated that, after she refused to get out of the vehicle, he grabbed her clothing and other belongings and threw them out of the vehicle's window into the street. According to defendant's testimony, he reached across, pulled the door handle, and pushed her out of the vehicle.

**B**

**Swiridowsky's Prior Assault Conviction**

Prior to trial, the court considered the admissibility of three of defendant's prior criminal convictions: an assault conviction, a conviction for leaving the scene of an accident, and a larceny conviction. Preliminarily, the trial justice determined that the assault and larceny convictions would be admissible, but the conviction for leaving the scene of the accident would not be allowed into evidence. However, before defendant testified, the trial justice revisited his ruling on the admissibility of defendant's convictions. At that point, the trial justice ruled that all

three prior convictions were admissible,[4] noting that the prior convictions had "substantial probative value."  In ruling on the assault conviction, the trial justice noted:

> "[T]he Connecticut act * * * is a violent act.  It's a prior conviction, and it does once again go to the defendant's questionable conduct and outward violations of the law.  * * * [I]t certainly seems to go to his propensity to violate the law.
> "All of this is important for the jury to know in considering whether or not he is answering the questions credibly. * * * [I]n State v. McWilliams, * * * there is a line that contains the quote, 'A jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is more likely to ignore the oath requiring veracity on the witness stand than a law-abiding citizen.'
> "By limiting the jury from being able to hear these prior convictions, the [c]ourt is concerned it's creating a legal fix, in masking the truth about whether or not the defendant can be truthful while on the stand, and the [c]ourt is hiding a number of convictions which do have something to do with his compliance with the law and his veracity."

When defendant ultimately took the stand, defense counsel began eliciting responses about defendant's past convictions.  In so doing, defendant answered in the affirmative to a question posed by defense counsel asking whether defendant "plea[ded] to a charge of assault in Connecticut."  The defendant then recounted the details of the facts underlying the assault conviction.

Defense counsel objected when the state on cross-examination inquired into the facts underlying the Connecticut assault charge.  In ruling on the objection, the trial justice stated, in the presence of the jury:

> "[L]et me tell the jury that when we're talking about the defendant's prior convictions, it's solely for your consideration in evaluating the defendant's credibility, any witness's credibility.  I'm instructing you that you may consider that evidence of a prior conviction in evaluating credibility, and that there's usually no other purpose, no probative force as proof of this crime, the crimes alleged in this indictment, the four charges before you."

---

[4] On appeal, defendant challenges only the trial justice's decision to allow impeachment of defendant by evidence of his prior assault conviction.  The defendant does not challenge the admissibility of his convictions for leaving the scene of an accident and larceny.

The state then proceeded to ask questions about the facts underlying the same convictions that had been delved into on direct examination.

## II

## Standard of Review

"It is well settled in this jurisdiction that '[t]he trial justice is vested with a considerable degree of discretion in deciding whether or not to admit evidence of prior convictions to impeach a witness.'" State v. Gongoleski, 14 A.3d 218, 222 (R.I. 2011) (quoting State v. Remy, 910 A.2d 793, 796 (R.I. 2006)). Accordingly, "this Court will not overturn such a decision on appeal unless there has been an abuse of that discretion." State v. McRae, 31 A.3d 785, 789 (R.I. 2011) (quoting Gongoleski, 14 A.3d at 222).

In regard to the motion for a new trial, "this Court 'accord[s] great weight to a trial justice's ruling on [such a motion] if he or she has articulated sufficient reasoning in support of the ruling.'" State v. Kizekai, 19 A.3d 583, 589 (R.I. 2011) (quoting State v. Guerra, 12 A.3d 759, 766 (R.I. 2011)). In setting forth the rationale for a decision, "'the trial justice need not refer to all the evidence supporting the decision,' rather he 'need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards.'" Id. (quoting Guerra, 12 A.3d at 766). Especially pertinent to the case at hand, "[w]e employ [a] deferential standard of review because 'a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" State v. Mitchell, 80 A.3d 19, 27-28 (R.I. 2013) (quoting State v. Covington, 69 A.3d 855, 863 (R.I. 2013)). Accordingly, "[i]f the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was

- 9 -

otherwise clearly wrong." State v. Bunnell, 47 A.3d 220, 233 (R.I. 2012) (quoting State v. Cipriano, 21 A.3d 408, 429 (R.I. 2011)).

## III

## Discussion

## A

## Impeachment with Assault Conviction

On appeal, defendant challenges the trial justice's midtrial ruling[5] permitting impeachment by admission of defendant's prior conviction for assault. He asserts that the trial justice improperly balanced the probative value and the prejudicial effect of the conviction. He further contends that the trial justice's error resulted in substantial prejudice to defendant, which was not cured by the trial justice's "brief, bare-boned limiting instruction" given to the jury. We disagree.

As a threshold matter, the state asserts that this contention should be deemed to have been waived because evidence of the prior assault conviction was elicited during direct examination of defendant. Notably, this Court has not had the opportunity to address whether such circumstances would preclude defendant from challenging on appeal the trial justice's determination based on Rule 609 of the Rhode Island Rules of Evidence. However, the state urges this Court to adopt a rule similar to the rule adopted by the United States Supreme Court in regard to Rule 609 of the Federal Rules of Evidence. See Ohler v. United States, 529 U.S. 753,

---

[5] In his brief, defendant also argues that the trial justice erroneously based his pretrial decision on Rule 404 of the Rhode Island Rules of Evidence, claiming that "the looping and often outright erroneous reasoning that led the trial court to its decision reveals a mosaic of prejudicial error that also highlights the improper way in which this jury likely considered that evidence." However, defendant also recognized that only the final ruling by the trial justice, which happened midtrial, is the subject of this appeal. We agree, and so we do not address defendant's Rule 404 argument as an independent contention. Instead, we consider the trial justice's pretrial ruling only as it relates to his final ruling.

- 10 -

760 (2000) (holding that, even where there has been an in limine ruling permitting impeachment by a prior conviction, "a defendant who preemptively introduces evidence of a prior conviction on direct examination may not on appeal claim that the admission of such evidence was error"). Because we are satisfied that the trial justice in this case did not abuse his discretion in permitting impeachment by introduction of defendant's prior assault conviction, we need not make such a determination. We save for another day, therefore, the question of whether a defendant in a criminal case should be deemed to have waived his right to challenge a trial justice's Rule 609 determination under the Rhode Island Rules of Evidence by delving into the conviction on direct examination.

Turning to the merits, Rule 609 provides for the admission of evidence of a witness's prior convictions unless the trial justice determines that the prejudicial effect of the conviction substantially outweighs its probative value.[6] "In contrast to Rule 609 of the Federal Rules of Evidence, our Rule 609 provides that the prior conviction need not involve dishonesty, false statement, or a felony to be admissible [for impeachment purposes]." McRae, 31 A.3d at 792 (quoting Gongoleski, 14 A.3d at 222-23). The rationale behind admission of all prior convictions for the purpose of impeachment, instead of only those involving dishonesty, "is that the jury should be able to consider whether or not a person who has previously broken the law

---

[6] Specifically, Rule 609 of the Rhode Island Rules of Evidence states in pertinent part:

"(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record.

"(b) Discretion. Evidence of a conviction under this rule is not admissible if the court determines that its prejudicial effect substantially outweighs the probative value of the conviction. If * * * the conviction is for a misdemeanor not involving dishonesty or false statement, the proponent of such evidence shall make an offer of proof * * * so that the adverse party shall have a fair opportunity to contest the use of such evidence."

may have such disrespect for the law as to render him or her unwilling to abide by the oath requiring truthfulness while testifying." Remy, 910 A.2d at 798.

We perceive no abuse of discretion in the trial justice's decision to admit defendant's prior conviction for assault. In discussing the three prior convictions, the trial justice recognized that, "[e]ven though the [c]ourt was highly concerned about the prejudice before, the prejudicial value must be weighed with the probative value." Concluding that there was "substantial probative value," the trial justice determined that the prejudicial effect would not render the prior convictions inadmissible. In addition, the trial justice discussed the conviction as being illustrative of defendant's outward violations of the law and indicated that the jury may infer that defendant's repeated refusals to comply with society's rules may lead him to be more likely to ignore the oath and to testify falsely. Further, the trial justice noted that he was concerned with "masking the truth about whether or not the defendant can be truthful while on the stand * * * [by] hiding a number of convictions which do have something to do with his compliance with the law and his veracity." The trial justice was within his discretion to conclude that defendant's assault conviction was admissible to impeach defendant's credibility.

The defendant argues that the admission of his two other felony convictions (one conviction for leaving the scene of an accident and one conviction for larceny) was sufficient for impeachment and rendered any probative value of introducing another conviction negligible. However, given the posture of defendant's criminal history, we conclude that the admission of the assault conviction was highly probative, as it conveyed to the jury that defendant's history of disregarding society's rules has spanned more than just one year. It is well settled that the probative importance of a criminal conviction is derived from this Court's recognition that "[a] jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is

more likely to ignore the oath requiring veracity on the witness stand than a law abiding citizen." State v. McWilliams, 47 A.3d 251, 262 (R.I. 2012) (quoting State v. Mattatall, 603 A.2d 1098, 1118 (R.I. 1992)).  Notably, defendant's assault conviction occurred in 2006, while the other two convictions that were admitted for impeachment purposes both occurred in 2010.  The disparity in dates would allow the jury to infer that defendant's repeated refusals to comply with society's rules were not isolated, but spanned a significant part of defendant's past.  Moreover, it was especially important for the jury to receive this information, since the case largely hinged on a credibility determination between Sarah and defendant.  Therefore, the probative value of defendant's assault conviction was significant.

Further, the prejudicial effect of the testimony was not substantial.  While defendant points to the similar nature of the prior conviction to the crime charged to argue that the prior conviction was highly prejudicial,[7] this Court has repeatedly recognized "that the similarity of the prior offenses does not render them per se inadmissible for the purpose of impeaching a testifying defendant's character for truthfulness."  State v. Whitfield, 93 A.3d 1011, 1018 (R.I. 2014).  In the instant case, defendant's prior conviction for assault was non-sexual in nature and clearly different from the sexual assaults for which defendant was charged.  Indeed, on numerous occasions, we have upheld the admission of prior convictions that were much more similar to the charged crime than in the instant case.  See id. at 1017-18 (affirming trial justice's decision to

---

[7] Similarly, defendant argues that the trial justice also erred by attaching probative importance to the similar nature of the conviction and the charged crime when he noted that the previous conviction was a "violent act."  Our reading of the record, however, indicates that the trial justice merely noted that the prior assault was a violent act.  Indeed, the trial justice was required to make such a finding.  See State v. Mattatall, 603 A.2d 1098, 1117 (R.I. 1992) ("The trial justice must balance the remoteness of the conviction, the nature of the crime, and the defendant's disdain for the law as represented by the extent of his prior criminal record, to determine whether the relevance with respect to credibility outweighs the prejudicial effect to the defendant." (emphasis added)).  Accordingly, we find defendant's argument unconvincing.

allow fourteen of the defendant's prior convictions, including some for assault and battery, to impeach the credibility of the defendant, who was on trial for assault); Remy, 910 A.2d at 799 (affirming trial justice's decision to allow the defendant's prior convictions for simple assault and misdemeanor domestic assault to impeach the credibility of the defendant, who was on trial for assault with a dangerous weapon). The prior conviction for assault at issue in this case is no more prejudicial than the similar, and sometimes identical, prior convictions of the defendants in the cases cited above. Accordingly, the similarity between defendant's prior conviction of assault and the charges for which he was being tried was simply not enough to produce such a prejudicial effect that substantially outweighed its significant probative value.

We note that the trial justice also gave a cautionary instruction, tempering any potential prejudice to defendant. The defendant contends that this cautionary instruction was ineffective because it was "brief [and] bare-boned," and because the instruction was given only once during trial.[8] We are not convinced. When a trial justice decides to give a cautionary instruction, this Court must determine whether the instruction "can be fairly said to have removed from [the jurors' minds], when weighing the evidence properly before them, the taint represented by the enveloping smoke of a criminal record." State v. Coleman, 909 A.2d 929, 936 (R.I. 2006) (quoting State v. Brown, 528 A.2d 1098, 1103 (R.I. 1987)). Here, the trial justice instructed the jury that the prior conviction might be considered "in evaluating credibility, and * * * there's

[8] The defendant also takes issue with the fact that the prosecutor highlighted the convictions in closing arguments, asserting that a timely instruction from the court was necessary at this time to prevent the jury from using the prior convictions improperly. However, defense counsel did not object to the state's closing arguments and did not request a cautionary instruction. The defendant's argument that one should have been provided is, therefore, waived. State v. Portes, 840 A.2d 1131, 1141 (R.I. 2004) ("[F]or a defendant to preserve a question of prejudicial error in closing argument for our review, he [or she] must not only make an objection at the time, but must make a request for cautionary instructions * * *.").

- 14 -

usually no other purpose, no probative force as proof of this crime." We are satisfied that, with this concise instruction, the trial justice adequately delineated the limited purpose for which the evidence was admitted.

**B**

**Denial of Motion for New Trial**

"When deciding whether to grant or deny a motion for a new trial, 'the trial justice acts as a thirteenth juror.'" State v. Navarro, 33 A.3d 147, 156 (R.I. 2011) (quoting State v. Pineda, 13 A.3d 623, 640-41 (R.I. 2011)). "The trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting Pineda, 13 A.3d at 641). The motion for a new trial should be denied if, after conducting this independent review, "the trial justice concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did * * *." Pineda, 13 A.3d at 641 (quoting State v. Espinal, 943 A.2d 1052, 1058 (R.I. 2008)).

We perceive no error in the trial justice's denial of the motion for a new trial. In conducting his review of the trial proceedings, the trial justice determined that "[Sarah] was credible, very credible, consistent and detailed." He also recognized that "she remained consistent and credible even through cross-examination." After evaluating the testimony and credibility of the rest of the state's witnesses, the trial justice turned to the testimony of defendant. He considered defendant's testimony regarding his prior convictions, noting that defendant's testimony on direct examination often left many details to later be exposed through cross-examination. The trial justice then concluded that he found defendant "not credible,

- 15 -

manipulative and self-justifying particularly in regards to his obvious past criminal behavior." The trial justice also evaluated defendant's character witnesses, determining that, "[a]lthough they all seem to be fine, compassionate people who actually cared about Mr. Swiridowsky * * * [t]hey did not know of [his] criminal history * * * and, therefore, the [c]ourt can't give any significant weight to their testimony about what type of person Mr. Swiridowsky is." Ultimately, the trial justice concluded that he was "far more inclined to find [Sarah] to be truthful and consistent than Mr. Swiridowsky, and [found] that the jury was well within its prerogative to find that the State ha[d] met its high burden of proving its case beyond a reasonable doubt."

Nevertheless, defendant contends that the trial justice erred by failing to consider the weaknesses in Sarah's account. Specifically, defendant points to Sarah's testimony at trial that her attacker did not brandish a firearm until they were both in the vehicle and juxtaposes this against her initial report that she had been forced into the vehicle at gunpoint. In addition, defendant questions Sarah's decision to remain in the vehicle, rather than attempting to flee, when defendant walked around the vehicle to get into the driver's side. Finally, defendant asserts that it is simply too coincidental that defendant parked within a few houses of Sarah's apartment, suggesting that Sarah directed him to the location.

However, the trial justice was not required to evaluate and refute each weakness in Sarah's account. In deciding a motion for a new trial, the trial justice does not need to parse through every potential inconsistency or inaccuracy. See Kizekai, 19 A.3d at 589 ("In providing a rationale for a decision, * * * the trial justice need not refer to all the evidence supporting the decision[.]"). In the case at bar, the conflicting accounts between Sarah and defendant rendered the trial largely dependent on a credibility determination. The trial justice, after being present through the trial, assessed the evidence and the credibility of each of the witnesses and

- 16 -

determined that the jury's verdict was supported by the evidence. Notably, the discrepancies in Sarah's testimony pointed to by defendant were not so grave as to lead us to conclude that the trial justice "overlooked or misconceived material evidence" in crediting her testimony over that of defendant. Accordingly, the trial justice's determination, made in accordance with the procedures outlined in our case law, will not be disturbed by this Court. See id. at 590.

The defendant also claims that the trial justice's credibility determination was flawed because he did not analyze defendant's testimony about the events in question. Contrary to defendant's assertion, however, the trial justice did consider defendant's account of the incident. Specifically, the trial justice summarized defendant's portrayal of the events, stating, "[h]e claimed he had never had difficulty acquiring sexual partners so he would have no need to commit a sexual assault, and he stopped only to offer help and drugs to [Sarah] while she walked the streets of Providence at 5 a.m." The trial justice determined that defendant was not credible, leading him to dismiss defendant's account. See Mattatall, 603 A.2d at 1109 (noting that, "when a defendant elects to testify, he runs the very real risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth").

We perceive no basis for concluding that the trial justice was either clearly wrong or that he misconceived or overlooked material evidence in denying the defendant's motion. Accordingly, we uphold the trial justice's denial of the defendant's motion for a new trial.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The materials associated with this case may be remanded to that court.



**TITLE OF CASE:**          State v. Christopher Swiridowsky

**CASE NO:**          No. 2014-133-C.A.
                                (P1/11-3317A)

**COURT:**          Supreme Court

**DATE OPINION FILED:**   November 12, 2015

**JUSTICES:**          Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                                Associate Justice Jeffrey A. Lanphear

**ATTORNEYS ON APPEAL:**

                                For State:  Aaron L. Weisman
                                          Department of Attorney General

                                For Defendant:  Angela M. Yingling
                                          Office of the Public Defender